UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RADWARE, LTD., AND RADWARE, INC., <br><br>Plaintiffs, <br><br>v. <br><br>F5 NETWORKS, INC., <br><br>Defendant(s). | Case No. C-13-02024-RMW <br><br>**ORDER DENYING RADWARE'S MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS** <br><br>[Re: Docket No. 60] |

Plaintiffs Radware, Ltd. and Radware, Inc. (collectively, "Radware") move to compel arbitration of F5 Networks, Inc.'s ("F5") patent infringement counterclaim and stay the litigation regarding the counterclaim pending the outcome of the arbitration. Dkt. No. 60. The primary issue is whether F5's patent infringement counterclaim falls within the scope of the arbitration clause in the parties' license agreement. For the reasons explained below, the court denies the motion.

## I.  BACKGROUND

Radware owns U.S. Patent Nos. 6,665,702 ("'702 Patent") (filed Dec. 20, 1999 and issued Dec. 16, 2003); 8,266,319 ("'319 Patent") (filed June 2, 2003 and issued Sept. 11, 2012) and 8,484,374 ("'374 Patent") (filed Aug. 3, 2012 and issued July 9, 2013) (collectively "patents-in-suit"), all titled "load balancing" and all generally directed to network management systems, devices

and methods for managing a computer network that is connected to the Internet through more than one IP address or internet service provider. Radware alleges that F5's BIG-IP and VIPRION products infringe the patents-in-suit. Dkt. No. 24 ("FAC") ¶ 16.

In its First Amended Answer ("FAA"), Dkt. No. 39, F5 counterclaimed for patent infringement of four of its patents. The counterclaim for patent infringement alleges that Radware's Alteon Application Switch products infringe U.S. Patent Nos. 6,473,802 ("the '802 Patent") (filed Dec. 4, 2001), 7,831,712 ("the '712 Patent") (filed Oct. 17, 2007), 8,103,770 ("the '770 Patent") (filed Nov. 8, 2010), and 8,392,563 ("the '563 Patent") (filed Dec. 29, 2011) (collectively "asserted patents"). FAA Counterclaims ¶¶ 3-9, 12-18. The '802 Patent was the subject of previous litigation between Radware and F5 in Seattle, Washington. *F5 Networks, Inc. v. Radware, Ltd. and Radware, Inc.*, No. 03-cv-00688-MJP (W.D. Wash.). *Id.* at ¶ 13. In 2004, Radware and F5 settled the lawsuit, resulting in part in a Nonexclusive Patent License Agreement, dated September 10, 2004 (the "License Agreement"). *Id*. Under the License Agreement, F5 granted Radware the right to practice the claims of the '802 Patent, its parent patent, Patent No. 6,374,300 (filed July 15, 1999), and all patents deriving from those two patents, "but only to the extent such Licensed Patent Rights cover the 'associative' or 'passive' modes of cookie persistence disclosed and claimed in the '802 Patent." License Agreement, Dkt. No. 60-2, Section 1. The '712 Patent, '770 Patent, and '563 Patent all derive from the '802 Patent. Significantly, the License Agreement also states that "[t]he Licensed Patent Rights shall not include the use of the 'insert' or 'rewrite' modes of cookie persistence claimed in the '802 Patent." *Id*. In its counterclaim, F5 alleges that Radware's Alteon Application Switch products "have practiced and still practice the 'insert mode' covered by claims of the F5 patents-in-suit."

The License Agreement also contains an arbitration clause providing that "[a]ny and all disputes between the parties arising out of or related to this Agreement (but not including any dispute relating to the validity of the Licensed Patent Rights), must be submitted for resolution by arbitration." License Agreement ¶ 5.1. Radware, contending that F5's patent infringement counterclaim falls within the scope of this arbitration clause, now moves the court to compel

arbitration on this counterclaim and stay litigation on the counterclaim until the arbitration is complete.

## II. ANALYSIS

### A. Legal Analysis

"[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). Because of the "liberal federal policy favoring arbitration agreements," "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983). However, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). As the parties in this case did not "clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T Techs.*, 475 U.S. at 649. The court must also decide the scope of arbitrable issues. *Moses H. Cone*, 460 U.S. at 24-25.

### B. Scope of the License Agreement

The court in this case must determine whether F5's counterclaim for patent infringement falls within the scope of the License Agreement's arbitration clause. It does not. The License Agreement only licenses the patents in F5's counterclaim to the extent that they cover the associative and passive modes of cookie persistence. F5 alleges that Radware's products infringe the insert mode of cookie persistence, so this dispute is not subject to arbitration under the License Agreement. The court denies Radware's motion to compel arbitration.

In its counterclaim for patent infringement, F5 alleges that Radware's Alteon Application Switch products infringe only the asserted patents' claims to an insert mode of cookie persistence. The relevant paragraph of the complaint reads, in full:

> Radware, alone and in conjunction with others, has in the past and continues to infringe the F5 patents-in-suit by making, using, selling, offering to sell and importing systems, software, products and/or services, including but not limited to Radware's "Alteon Application Switch"

> products (the "Accused Products") that alone or in combination with other devices or products are covered by at least one claim of the F5 patents-in-suit, and are liable for patent infringement pursuant to 35 U.S.C. § 271. More specifically, the Accused Products have practiced and still practice the "insert mode" covered by claims of the F5 patents-in-suit.

FAA Counterclaims ¶ 15. The counterclaim also alleges that "Radware is using the non-licensed 'insert mode' technology in the Accused Products, thereby violating F5's patent rights, with full knowledge that the "insert mode" is not licensed." *Id*. at ¶ 18. F5's counterclaim never alleges infringement of the asserted patents' claims to "associative" or "passive" modes of cookie persistence, the only two modes licensed to Radware under the License Agreement. As the License Agreement explicitly excludes the insert and rewrite modes of cookie persistence, License Agreement, Section 1, F5's counterclaim is not "arising out of or related to" to License Agreement, License Agreement ¶ 5.1, and is thus not subject to arbitration.

     Radware argues that the parties' agreement to arbitrate "any disputes arising out of or related to" the License Agreement includes the preliminary dispute about the scope of the arbitration clause. According to Radware, upon Radware merely asserting that the License Agreement includes F5's counterclaim, this court must compel arbitration on whether the scope of the License Agreement in fact encompasses F5's counterclaim. Radware is mistaken. As noted above, unless the parties "clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T Techs*., 475 U.S. at 649. The License Agreement's provision requiring arbitration of "any disputes arising out of or related to" the License Agreement is not a clear and unmistakable statement that the parties agreed to arbitrate disputes over the scope of the License Agreement itself. Moreover, the Supreme Court, assuming that courts can properly decide the scope of an arbitration clause, held that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24-25. Here, recognizing the "liberal federal policy favoring arbitration agreements," there are no "doubts concerning the scope of arbitrable issues." *Id*. F5 represented in its briefing and at the hearing on this motion that it has not and will not assert infringement of the associative or passive modes of cookie persistence. The License Agreement plainly excludes patent infringement claims

concerning the insert and rewrite modes of cookie persistence, and F5's counterclaim is unambiguously confined to the insert and rewrite modes of cookie persistence.

Radware also contends that the License Agreement includes the insert and rewrite modes because the associative mode in the '802 Patent uses an insert and rewrite functionality. Before even examining the '802 Patent, the court notes that Radware's argument is questionable. If the License Agreement intended to give Radware the right to practice the insert and rewrite modes, it probably would not have explicitly excluded the insert and rewrite modes by stating that "[t]he Licensed Patent Rights shall not include the use of the 'insert' or 'rewrite' modes of cookie persistence claimed in the '802 patent." License Agreement, Section 1. Turning to the '802 Patent confirms that the insert and rewrite modes are not subsets of the associative mode of cookie persistence. Rather, the insert mode and associative modes are two distinct processes. Figures 3B and 6B of the '802 Patent portray the associative and insert modes, respectively. As shown in the figures, these are two different processes, particularly with respect to the logic in items 168 and 170 (Fig. 3B) versus items 254, 256, and 258 (Fig. 6B). Furthermore, the '802 Patent always describes the associative and insert modes as separate modes. It is difficult to imagine a statement clearer on this issue than the abstract of the '802 Patent:

> There are four modes for employing the Cookie to persistently direct HTTP connections. The associative mode inserts a Cookie that uniquely identifies the client into an HTTP response. The passive mode inserts Cookie information that uniquely identifies a previously selected destination into an HTTP response. In the rewrite mode, a network device manages the destination information that is rewritten over blank Cookie information generated by the destination producing the HTTP response. The insert mode inserts and removes Cookie information in the data packets for HTTP requests and responses prior to processing by the destination.

'802 Patent at [57]. In addition, the "Detailed Description of the Preferred Embodiment" section of the '802 Patent has a separate section for each mode. *See, e.g.*, '802 Patent at 9:21-10:44 (associative mode); '802 Patent at 12:46-13:43 (insert mode). Simply put, Radware ignores the unambiguous language of the License Agreement and the clear description in the '802 Patent. The mere use of the words "insert" and "rewrite" in describing the associative mode does not mean that the insert and rewrite modes are subsets of the associative mode.

### III.  ORDER

For all the reasons stated above, the court denies Radware's Motion to Compel Arbitration and to Stay Proceedings.

Dated:  December 23, 2013

*Ronald M. Whyte*
RONALD M. WHYTE
United States District Judge