FABIO E. MARINO (SBN 183825)
fmarino@mwe.com
A. MARISA CHUN (SBN 160351)
mchun@mwe.com
L. KIERAN KIECKHEFER (SBN 251978)
kkieckhefer@mwe.com
NITIN GAMBHIR (SBN 259906)
ngambhir@mwe.com
BARRINGTON DYER (SBN 264762)
bdyer@mwe.com
TERI H.P. NGUYEN (SBN 267498)
thpnguyen@mwe.com
McDERMOTT WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA  94025-4004
Telephone:     650 815 7400
Facsimile:     650 815 7401

Attorneys for Plaintiffs and Counterclaim-Defendants
RADWARE, LTD. AND RADWARE, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RADWARE, LTD., an Israeli company; RADWARE, INC., a New Jersey corporation,<br><br>     Plaintiffs, Counterclaim-Defendants,<br><br>vs.<br><br>F5 NETWORKS, INC., a Washington corporation,<br><br>     Defendant, Counterclaim-Plaintiff. | CASE NO. 5:13-cv-02024 RMW<br>(Related Case No. 5:13-cv-02021 RMW)<br><br>**RADWARE PLAINTIFFS' REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT DISMISSING DEFENDANT F5'S INVALIDITY AFFIRMATIVE DEFENSE**<br><br>Date:      July 24, 2015<br>Time:     9:00 a.m.<br>Judge:    Hon. Ronald M. Whyte<br>Location: Ctrm 6, 4th Floor |

**REDACTED PUBLIC VERSION**

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................... 1

II. F5'S ATTORNEY ARGUMENT REGARDING "CONCEPTION DATE" CANNOT DEFEAT SUMMARY JUDGMENT ................................................................................. 2

III. F5'S ATTORNEY ARGUMENT REGARDING RADWARE'S "REDUCTION TO PRACTICE" DATE AND DILIGENCE ALSO CANNOT DEFEAT SUMMARY JUDGMENT ..................................................................................................................... 6

    A. Radware Established Its Reduction To Practice Date. ............................................. 6

    B. Radware Was Diligent In Reducing Its Invention To Practice. ............................... 7

IV. F5 OFFERS NO EVIDENCE SHOWING THAT THE MAKI-KULLAS PATENT OR THE CISCO DISTRIBUTED DIRECTOR WHITE PAPER CONSTITUTE PRIOR ART. ................................................................................................................................... 8

    A. The Maki-Kullas Patent Is Not Prior Art. ................................................................ 8

    B. The Cisco Distributed Director White Paper Is Not Prior Art. ................................ 8

V. F5 OFFERS NO COMPELLING CHALLENGE TO RADWARE'S MOTION ON THE CISCO DISTRIBUTED DIRECTOR AND THE BIG-IP (3-DNS) TEST-BEDS ........... 11

VI. SUMMARY JUDGMENT SHOULD BE GRANTED WITH RESPECT TO PRIOR ART FOR WHICH F5 OFFERS NO EXPERT EVIDENCE OR OPINION ............................. 13

VII. CONCLUSION .............................................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*Alexsam, Inc. v. IDT Corp.*,
   715 F.3d 1336 (Fed. Cir. 2013) ................................................................................................14

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ....................................................................................................................3

*Apple, Inc. v. Samsung Elecs. Co.*,
   No. 12-CV-00630-LHK, 2012 U.S. Dist. LEXIS 92314
   (N.D. Cal. July 3, 2012) ............................................................................................................12

*Brocade Communications v. A10 Networks, Inc.*
   Case No. 5:10-cv-03428-LHK (N.D. Cal. 2012) ......................................................................10

*Brown v. Barbacid*,
   436 F.3d 1376 (Fed. Cir. 2006) ..............................................................................................2, 8

*CNET Networks Inc. v. Etilize Inc.*,
   584 F. Supp. 2d 1260 (N.D. Cal. 2008) .....................................................................................9

*Ethicon, Inc. v. U.S. Surgical Corp.*,
   135 F.3d 1456 (Fed. Cir. 1998) ..................................................................................................6

*Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*,
   287 F.3d 1108 (Fed. Cir. 2002) ................................................................................................13

*Finjan, Inc. v. Secure Computing Corp.*,
   626 F.3d 1197 (Fed. Cir. 2010) ................................................................................................13

*Gemtron Corp. v. Saint-Gobain Corp.*,
   572 F.3d 1371 (Fed. Cir. 2009) ..............................................................................................1, 2

*Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*,
   45 F.3d 1550 (Fed.Cir. 1995) .....................................................................................................5

*Golden Bridge Technology Inc., v. Apple, Inc.*,
   No. 5:12-cv-04882, 2014 WL 1928977 (N.D. Cal. May 14, 2014) ...........................................8

*Invista North America S.A.R.L. v. M & G USA Corp*
   951 F.Supp. 2d 626, 652 (D. Del. 2013). .................................................................................14

*Invitrogen Corp. v. Clontech Labs., Inc.*
   429 F.3d 1052 (Fed. Cir. 2005) ..........................................................................................3, 4, 5

*Johnston v. IVAC Corp.*,
   885 F.2d 1574 (Fed. Cir. 1989) ..............................................................................................1, 2

*Kridl v. McCormick*,
   105 F.3d 1446 (Fed.Cir.1997)...................................................................................................5

*Linear Tech. Corp. v. Impala Linear Corp.*,
   379 F.3d 1311 (Fed. Cir. 2004)..............................................................................................2, 7

*Matsushita Elec. Indus. Co. v. Zenith Radio*,
   475 U.S. 574 (1986)...................................................................................................................3

*Meyer Intellectual Props. Ltd. v. Bodum, Inc.*,
   690 F.3d 1354 (Fed. Cir. 2012)................................................................................................14

*Neely v. St. Paul Fire & Marine Ins. Co.*,
   584 F.2d 341 (9th Cir. 1978)......................................................................................................3

*Proveris Scientific Corp. v. Innovasystems, Inc.*,
   536 F.3d 1256 (Fed. Cir. 2008)................................................................................................14

**Statutes**

35 U.S.C. §102(a), (b)......................................................................................................................11

Fed. R. Civ. P. 701..........................................................................................................................15

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

## I. INTRODUCTION

In its Opposition (Dkt. 196-04 ("Opp.")), F5 presents *no evidence* in response to Radware's Motion for Summary Judgment (Dkt. 179-04 ("Motion")). Opp. at 1. For example, in response to Radware's detailed evidence of conception, reduction to practice and diligence, F5 points to no disputed facts that would allow it to survive summary judgment, but only offers a weak denial in the form of unsupported attorney argument. Attorney argument is, of course, insufficient to defeat summary judgment. *See Gemtron Corp. v. Saint-Gobain Corp.,* 572 F.3d 1371, 1380 (Fed. Cir. 2009) ("unsworn attorney argument is not evidence"); *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1581 (Fed. Cir. 1989)(same). This is particularly true for issues, such as invalidity, on which F5 carries the ultimate burden of proof by clear and convincing evidence.

Nowhere is F5's failure to carry its burden on invalidity exemplified better than by the fact that its technical expert, Peter Alexander, offered no opinions at all on the allegedly disputed dates of conception, reduction to practice and diligence. One would expect that if F5 truly could carry its burden of proving invalidity at trial, it would have proffered expert opinions challenging Radware's inventors' corroborated testimony and Radware's expert opinions on these very matters. Yet, F5 presented no such evidence. That is because none exists and, in the absence of such evidence, F5 cannot carry its burden and summary judgment is appropriate.

But even if unsupported attorney argument were legally sufficient to withstand summary judgment (and it, most definitely, is not), F5's arguments are plainly untenable. For example, F5's primary retort against Radware's conservative assertion of an ▮▮▮▮▮ conception date is that "[o]ther than the unsupported testimony of the inventors, Radware relies on a single three-line email from one of the inventors, Mr. Zisapel, to another of the inventors, Ms. Fuks." Opp. at 4. In other words, F5 argues that *if one were to ignore the corroborating evidence (i.e. the* ▮▮▮▮▮ *email)*, then the inventors' testimony would not be corroborated. But the testimony F5 refers to was given in reference to the corroborating email: calling such testimony "uncorroborated" raises serious questions as to the merits of F5's arguments. Similarly, F5 argues that it is disputed whether the press release issued on October 4, 1999 constitutes evidence corroborating Radware's reduction to practice (by releasing the LinkProof product) at least by

- 1 -

RADWARE'S REPLY ISO MSJ RE
INVALIDITY AFF. DEFENSE
CASE NO. 5:13-CV-02024 RMW

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1   October 4, 1999.  And, to be sure, F5 fails to identify any evidence even remotely suggesting the
2   LinkProof product was not released on October 4, 1999.  At best, F5's attorney arguments
3   amount to naked denials of Radware's evidence.  But that is insufficient, as a matter of law, to
4   survive summary judgment.  Thus, Radware's motion should be granted.

## II.   F5'S ATTORNEY ARGUMENT REGARDING "CONCEPTION DATE" CANNOT DEFEAT SUMMARY JUDGMENT

7   F5's Opposition presents no evidence in response to Radware's Motion.  Faced with the
8   inventors' corroborated testimony swearing behind the alleged prior art, all F5 can offer is "you
9   didn't show me" attorney argument which is insufficient, as a matter of law, to defeat summary
10  judgment.  *See Gemtron Corp.,* 572 F.3d at 1380; *Johnston,* 885 F.2d at 1581.
11  "Corroborated evidence is evaluated under a 'rule of reason' analysis."  *Linear Tech.*
12  *Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1327 (Fed. Cir. 2004).  The preferred corroborating
13  evidence is contemporaneous records but circumstantial evidence and oral testimony may also
14  corroborate a witness's testimony.  *Id.*  "[C]orroboration of every factual issue contested by the
15  parties is not a requirement of law" and the evidence must be "considered 'as a whole, not
16  individually' in evaluating whether . . . testimony is credible."  *Brown v. Barbacid*, 436 F.3d
17  1376, 1380 (Fed. Cir. 2006) (internal citations omitted).  Here, Radware presented more than just
18  circumstantial evidence to show that the conception date of the Asserted Patents is ███████.
19  Radware presented contemporaneous *direct* evidence.  Motion at 2.
20  Tellingly, F5 does not argue that Radware did not conceive of the link load balancing
21  ("LLB") inventions at least as early as ███████.  Rather, it complains that "[o]ther than the
22  *unsupported* testimony of the inventors, Radware relies on a single three-line email from one of
23  the inventors, Mr. Zisapel, to another of the inventors, Ms. Fuks."  Opp. at 4 (emphasis added).
24  The fact that F5 mischaracterizes the evidence—the contemporaneous email, of course, *does*
25  support the inventors' testimony as to the conception date—deprives F5's attorney argument of
26  any credibility from the outset.
27  Throughout this case, both parties have used the term "link load balancing" to describe the
28

- 2 -

RADWARE'S REPLY ISO MSJ RE
INVALIDITY AFF. DEFENSE
CASE NO. 5:13-CV-02024 RMW

inventions of the Asserted Patents.[1]  And the contents of the email, including the specific reference to "link load balancing" and the surrounding testimony provide the necessary corroboration for the inventors' testimony regarding the conception date.  In response, F5 fails to provide *any* evidence to create a genuine factual dispute, as it cannot do so.  *See Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986) (an issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party); *Neely v. St. Paul Fire & Marine Ins. Co.*, 584 F.2d 341, 344 (9th Cir. 1978) ("[a]n opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify denial of the motion.").

"Conception defines the legally operative moment of invention under §102(g).  It is the 'formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice.'"  *Invitrogen Corp. v. Clontech Labs., Inc*. 429 F.3d 1052, 1063 (Fed. Cir. 2005).  Mr. Zisapel testified that he had already conceived of the idea of link load balancing *before* ▮.  *See* Dkt. 186-07 at 438:9-440:12.  As he explained, the ▮ email is related to the "productizing" of the LLB invention into an existing product; that is, turning the invention into a product—which necessarily must come *after* the invention is conceived.  *Id*.  It is self-explanatory that the idea (ready to be productized by ▮) was then conceived ***at least as early as*** ▮.  In fact, the ▮ date is a conservative approximation of when the specific idea of achieving LLB was conceived.  *See* Gambhir Decl., Ex. B (Zisapel Depo. Tr.) at 442:11-19 ("▮").

F5 does not present any specific facts to even attempt to rebut Radware's corroborated testimony that the conception date is at least as early as ▮ to show an issue for trial.

---

[1] *See, e.g.*, Dkt. 187-14 (Banks Report dated February 23, 2015) at ¶4("the Radware patents relate to load balancing across ISPs, sometimes referred to as "link load balancing"), ¶5; Declaration of Nitin Gambhir ISO Radware's Reply ("Gambhir Decl."), Ex. A (Alexander Report dated January 20, 2015) at ¶106 ("▮"), ¶¶38-39, 394; *see also* Dkt. 188-06 (Thornewell Decl.) at ¶16.

1   Instead, F5 argues that Radware fails to offer "any analysis as to how [the ▮▮▮▮▮] email
2   relates to any of the limitations of the asserted claims." Opp. at 5.  That is not true.  There is no
3   dispute that this email shows Mr. Zisapel instructing his co-inventor to add the "▮▮▮▮▮
4   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Dkt. 186-08
5   (emphasis added).  As Mr. Zisapel explained, this metric is specific to link load balancing (as
6   opposed to firewall load balancing—which was present in the product). Dkt. 186-07 at 438:9-
7   440:12.  And there is no dispute between the parties that "link load balancing" is used to describe
8   and cover both inbound and outbound functionality of the invention described in the Asserted
9   Patents.  For example, F5's expert Mr. Alexander explained that the Asserted Patents cover the
10  idea of LLB.  *See*, Gambhir Decl., Ex. A at ¶¶38-39.

11  Similarly, Radware's expert Dr. Rubin opined that "[l]ink load balancing or LLB is a
12  technique that takes advantage of such a configuration by load balancing traffic across multiple
13  ISP links in a multi-homed environment" and that "Radware's Patents cover the link load
14  balancing technology that Radware pioneered." Dkt. 179-26 at ¶¶61, 77.  Thus, both experts
15  agree that the invention described in the Radware Patents is LLB.  There can be no genuine
16  factual dispute that Mr. Zisapel's ▮▮▮▮▮ email not only relates to the invention but
17  corroborates his testimony that the inventors had a "definite and permanent idea of the complete
18  and operative invention, as it is hereafter to be applied in practice" or productized into the
19  LinkProof product. *Invitrogen Corp.* 429 F.3d at 1063.

20  Moreover, there is no dispute among the experts regarding the ▮▮▮▮▮ corroborating
21  email.  F5's Mr. Alexander does not dispute Radware's conception date.  *See* Gambhir Decl., Ex.
22  C (Alexander Depo. Tr.) at 33:10-13.  In contrast, Radware's expert Dr. Rubin reviewed both
23  deposition testimony and documents and concluded that the invention described in the Asserted
24  Patents was conceived at least as early as ▮▮▮▮▮.

25  F5's only response to Dr. Rubin's opinion is that "Radware's expert's opinion does not
26  provide any *independent* evidence as to the date of conception." Opp. at 6 (emphasis added).  But
27  that is a red-herring: there is no requirement for an expert to provide "independent evidence,"
28  rather it is customary to provide opinions based on the evidence provided by fact witnesses.

Indeed, the primary case F5 relies on, *Invitrogen,* does not even mention "independent evidence" and, in any event, is distinguishable. In *Invitrogen*, Clontech's motion for summary judgment to invalidate Invitrogen's patent relied on certain entries from an inventor's lab notebook to prove that he recognized and appreciated his invention, which turned out to contradict his deposition testimony that the entries at issue were not relevant to the disputed invention. *Invitrogen,* 429 F.3d at 1068. Given that Clontech's "contentions squarely conflict with inventor testimony interpreting the same underlying notebook entries," the court concluded that Clontech's expert testimony provided no factual guidance. *Id.*; *see also Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1562 (Fed.Cir. 1995). In contrast, here, there is no inconsistency between the inventors' testimony, the corroborating evidence of the ▮ email, and Dr. Rubin's opinions based on that evidence.

The inventors' testimony, as well as the ▮ email between them referring specifically to "link load balancing," constitute direct evidence that corroborate the "conception" documents Dr. Rubin analyzed and his ultimate conclusion that LLB as disclosed in the Asserted Patents were conceived at least as early as ▮. *See also* Rubin Supp. Decl.[2] at ¶¶5-6. Indeed, the ▮ email's use of the term "link load balancing" demonstrates that, at least by that date, the idea for the claimed invention was "complete," requiring only application to practice. *See e.g., Kridl v. McCormick,* 105 F.3d 1446, 1449 (Fed.Cir.1997) (conception is a "definite and permanent idea of the complete and operative invention" in the inventor's mind, as it is thereafter to be applied in practice.'"). In fact, other witnesses testified that their understanding of the LLB term is the same as their understanding of the term in ▮ *See* Gambhir Decl., Ex. D (Cherkassky Depo. Tr.) at 210:5-211, when Radware was using that term internally to describe the invention that would be embodied by the LinkProof product. *See* Gambhir Decl., Ex. E (Zisapel Depo. Ex. 50—email communication dated ▮).

---

[2] Supplemental Declaration of Prof. Izhak Rubin in Support of Radware's Motions for Partial Summary Judgment of Infringement and Dismissing F5's Invalidity Affirmative Defense.

### III. F5'S ATTORNEY ARGUMENT REGARDING RADWARE'S "REDUCTION TO PRACTICE" DATE AND DILIGENCE ALSO CANNOT DEFEAT SUMMARY JUDGMENT

F5 also offers no evidence to challenge Radware's evidence of when the latter reduced its invention to practice, as well as the diligence Radware expended from conception to practice.

#### A. **Radware Established Its Reduction To Practice Date.**

As with conception, F5 undermines its credibility by claiming —without any evidentiary support— that the press release issued on October 4, 1999 does not stand for what it states, ignoring the simple fact that the press release is not only dated October 4, 1999 but describes in details the features of the LinkProof product, which embodies the Asserted Patents.[3] Dkt. 189-06. Radware presented evidence to show that it reduced to practice the Asserted Patents, in the form of the LinkProof product, at least as early as October 4, 1999. Motion at 2-3; *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998) (corroborating evidence may come in the form of "contemporaneous documents prepared by the alleged inventor, circumstantial evidence about the inventive process, or oral testimony from someone other than the inventor.").

The title of the October 4, 1999 press release is self-explanatory: "Radware Announces LinkProof: The First IP Load Balancing *Solution* For Networks With Multiple ISP Connections." Dkt. 189-06 (emphasis added). It states that the LinkProof product by Radware is the first technology *designed* to intelligently load balance IP traffic between these 'multi-homed' sites". *Id*. (emphasis added). These examples (and the use of the past tense "designed" in the press release)[4] make it clear on its face that the LinkProof had not only already been designed, but was ready to be deployed at least as early as October 4, 1999. This is consistent with, and corroborates, the sworn testimony of Radware's corporate witness, Mr. Amir Peles.

The October 4, 1999 press release is direct, contemporaneous evidence that is independent

---

[3] F5 does not dispute that Radware's LinkProof product practices the inventions taught in the Asserted Patents. *See* Gambhir Decl., Ex. C at 33:24-34:4.

[4] "LinkProof verifies ISP health. . ."; "it performs Smart NAT. . ."; "LinkProof also uses proximity detection. . ."; "This feature allows the LinkProof to consistently use. . ."; "The LinkProof continuously monitors. . ." etc. are examples of language that conclusively show that LinkProof was not merely a "concept" product but an *actual* product by the time the press release was issued. *See* Dkt. 189-06.

1   of Radware's 30(b)(6) witness' testimony regarding the reduction to practice date, and is

2   consistent with the testimony of others who recall that the LinkProof product was being offered

3   for sale at least by October 4, 1999. *See* Gambhir Decl., Ex. D at 37:17-19; *see also* Rubin Supp.

4   Decl. at ¶6 (explaining that "███████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████████████

6   ██████████████████████████████████.").

### B.   Radware Was Diligent In Reducing Its Invention To Practice.

8   F5 offers no evidence to dispute the evidence of Radware's diligence in reducing to

9   practice the inventions claimed in the Asserted Patents. Instead, F5 questions each piece of

10  evidence Radware has proffered in isolation, and then inexplicably asserts that each is

11  "uncorroborated." Opp. at 9-11. But when considered in its totality, as the Court must do for

12  purposes of this motion, Radware's evidence amply shows that it was, indeed, diligent.

13  For example, the press release dated October 4, 1999 represents the earliest known date

14  when Radware announced the introduction of the LinkProof product. Leading up to that date,

15  Radware has offered witness testimony and numerous corroborating documents describing the

16  design and development of the LinkProof product. *See e.g.,* Dkt. 186-24 at ¶41; Gambhir Decl.

17  Ex. D at 124:1-8 (Mr. Cherkassky's testimony that between May and October 1999, he was

18  "████████████████████████████████████████████████████████████████").

19  All of this evidence corroborates Radware's diligent reduction of its inventions to practice

20  between ███████ and December 1999. *See, e.g.,* Rubin Supp. Decl. at ¶6. F5 questions the

21  accuracy of the dates appearing on the documents, but cites no reason to doubt its accuracy in

22  reflecting the date when that particular document or version was created. Next, F5 nitpicks that

23  the documents only account for certain time periods between ███ to December 1999 and not

24  others and, therefore, fail to corroborate diligence. But F5 has not pointed to any authority

25  requiring monthly or weekly logs to establish diligent reduction to practice. *See generally*, Opp.

26  at 9-11. The law is much more flexible with the type of evidence that can be used to establish

27  diligence. *Linear Tech.*, 379 F.3d at 1327("circumstantial evidence and oral testimony may also

28  corroborate a witness's testimony"); *Brown,* 436 F.3d at 1380 ("[C]orroboration of every factual

- 7 -

RADWARE'S REPLY ISO MSJ RE
INVALIDITY AFF. DEFENSE
CASE NO. 5:13-CV-02024 RMW

issue contested . . . is not a requirement of law").

## IV. F5 OFFERS NO EVIDENCE SHOWING THAT THE MAKI-KULLAS PATENT OR THE CISCO DISTRIBUTED DIRECTOR WHITE PAPER CONSTITUTE PRIOR ART.

### A. The Maki-Kullas Patent Is Not Prior Art.

F5's expert, Dr. Alexander, conceded that the Maki-Kullas patent is Section 102(e) art and not entitled to any earlier priority date than its October 5, 1999 filing date, which is several months *after* the *conception date* for Radware's '319 and '374 Patents. *See* Dkt. 189-07 (Yellin Decl., Ex. 6) at ¶163; Dkt. 109-08 at 160:15-161:6; Dkt. 186-24 at ¶39. The evidence establishes a conception date at least as early as ▇▇▇▇▇▇—the date of the earliest dated document Radware could locate using the term "link load balancing" to describe the patented invention. There is no dispute that ▇▇▇▇▇▇ is prior to the filing date of the Maki-Kullas patent, precluding it as prior art, let alone anticipatory prior art. However, even if the Court were to entertain the other dates F5 cites in an attempt to create a factual dispute, both the ▇▇▇▇▇▇ and October 4, 1999 (when the LinkProof product was introduced) dates are still *prior* to the priority date of the Maki-Kullas patent, precluding it as prior art. Finally, as discussed above, Radware has offered evidence demonstrating its diligent reduction to practice from a date just prior to the other party's conception to its reduction to practice. *See Golden Bridge Technology Inc., v. Apple, Inc.*, No. 5:12-cv-04882, 2014 WL 1928977 at *4 (N.D. Cal. May 14, 2014) (Grewal, J.).

### B. The Cisco Distributed Director White Paper Is Not Prior Art.

Similarly, the Cisco Distributed White Paper(s) by Kevin Delgadillo are not prior art. Two documents entitled, "Cisco DistributedDirector White Paper," include copyright notices that F5 claims establish them as prior art. *See* Dkt. 189-15 (Yellin Decl., Ex. 14) and Dkt. 186-13 (Yellin Decl., Ex.15). But closer inspection of Mr. Delgadillo's testimony shows they are not because there is no evidence either was *published* before the invention of the Asserted Patents.

F5 argues that a version of the White Paper bearing a 1997 copyright notice is prior art. Dkt. 186-13. The purported 1997 version is not only mutilated and incomplete having several

1   blank spaces throughout, it is internally inconsistent with respect to the copyright date: the last
2   page of the document containing Cisco's corporate information shows a different copyright notice
3   date. *See* Dkt. 186-13 at F5135080; Dkt. 186-10 (Mr. Alexander's testimony that he relied on
4   Exhibit 230 (Dkt. 186-13) despite recognizing that it is "mutilated" with "white spaces
5   throughout."). Indeed, Mr. Delgadillo testified that the copyright information on Cisco materials
6   was not necessarily reliable, because it did not always correspond to when the document was
7   actually publicly available. *See* Dkt. 189-17 (Yellin Decl., Ex. 16) at 15:1-9, 78:16-79:10. Given
8   this testimony and F5's failure to question Mr. Delgadillo about this document, there is
9   insufficient evidence to conclude that this document was *ever* published. Further, there is no way
10  to confirm the substance of this document, given the manner it was produced by F5 and that it
11  was never authenticated by the author. To survive summary judgment, F5 was required to
12  produce evidence showing this document was indeed published before the invention of the
13  Asserted Patents, but F5 has failed to produce any such evidence. Radware's motion should be
14  granted.

15  Next, F5 claims that another DistributedDirector White Paper bearing a 1999 copyright
16  notice is prior art. *See* Dkt. 189-15 (Yellin Ex. 14); Dkt. 189-17 at 30:19-31:17. However, the
17  purported 1999 copyright notice date does not help F5 either because the copyright date citing ***an***
18  ***entire year*** cannot prove by clear and convincing evidence that the White Paper was publicly
19  accessible prior to December 21, 1998, one year before the earliest filing date of the '319 and
20  '374 Patents, or even March 31, 1999, the day before the date of conception of ▮.
21  *See, e.g., CNET Networks Inc. v. Etilize Inc.*, 584 F. Supp. 2d 1260, 1273-74 (N.D. Cal. 2008)
22  (finding that a 2001 copyright date does not prove that the claimed prior art was publicly
23  accessible prior to April 10, 2001, one year before the earliest filing date of the asserted patent).
24  F5 asserts that the date of publication was late March 1999. But Mr. Delgadillo's 2014 testimony
25  on this issue credited his previous 2012 deposition as the source. *See* Dkt. 203-06 (2014
26  Delgadillo Depo. Tr.) at 31:10-17. And at his 2012 deposition, Mr. Delgadillo testified that April
27  12, 1999 was the *date of publication* on Cisco's external website. *See* Dkt. 189-18 (Yellin Decl.,
28  Ex. 17) at 11:18-14:4. In its Opposition, F5 points to the last page of the Cisco

- 9 -

RADWARE'S REPLY ISO MSJ RE
INVALIDITY AFF. DEFENSE
CASE NO. 5:13-CV-02024 RMW

1  DistributedDirector White Paper (Dkt. 189-15) which has printed, at the bottom corner, "3/99
2  LW," as evidence that it was publicly accessible on the Cisco webpage as of March 1999. Opp.
3  at 11-13. However, when asked about this document during his 2012 deposition, Mr. Delgadillo
4  testified that it was Laser Works, a third party, not Cisco, which added in the portion describing
5  Cisco's corporate headquarters.[5] *See* Dkt. 189-18 at 18:23-19:10. Although Mr. Delgadillo
6  claims he finished writing this document in March 1999, he had *no recollection* of when he sent it
7  to Laser Works for formatting and publication. *Id.* at 19:19-20:4.

8      Indeed, later in his 2012 deposition, Mr. Delgadillo testified that the DistributedDirector
9  White Paper was made publicly available on Cisco's external website on April 12, 1999. *Id.* at
10 11:18-14:4. F5 contends that he was referring to another document when he testified as to the
11 April 12, 1999 publication date in the prior litigation. Opp. at 13. But, perhaps recognizing that
12 the date would preclude it from qualifying as prior art, F5 has not produced this document.
13 During his 2012 deposition, Mr. Delgadillo was asked about Brocade Exhibit 2, which he
14 confirmed was "substantially identical" to Brocade Exhibit 3, noticing no differences between the
15 two documents other than formatting. *See* Dkt. 189-18 at 16:6-21 (agreeing that Brocade Exhibit
16 3 and Exhibit 2 "are substantively identical") (omitting objections). Critically, he also confirmed
17 that Brocade Exhibit 2 was published on Cisco's external website, as indicated by the "Posted:
18 Mon Apr 12 20:38:02 PDT 1999" time stamp on the document. *Id.* at 11:18-14:4; Gambhir
19 Decl., Ex. F:



---

[5] Radware has located the April 12, 1999 document, a separate exhibit ("Brocade Exhibit 2") used in Mr. Delgadillo's March 14, 2012 deposition in the prior *Brocade Communications v. A10 Networks, Inc.,* Case No. 5:10-cv-03428-LHK (N.D. Cal. 2012) matter. *See* Gambhir Decl. at ¶8. Brocade Exhibit 2 from Mr. Delgadillo's deposition is attached as Gambhir Decl., Ex. F. During his 2012 *Brocade* deposition, Mr. Delgadillo was asked about Exhibit 3 (as introduced in that deposition) ("Brocade Exhibit 3"), a copy of which is attached as Gambhir Decl., Ex. G. Furthermore, Brocade Exhibit 3 (Gambhir Decl., Ex. G) is the same document as the document previously filed at Dkt. 189-15 (Yellin Decl., Ex. 14), which is at issue here. *Compare* Gambhir Decl., Ex. G with Dkt. 189-15.

1  Taking this evidence as a whole, at best, Mr. Delgadillo's testimony indicates there were
2  two versions of the same White Paper, where only the April 12, 1999 version was made publicly
3  available, while the "3/99 LW" version was the draft Mr. Delgadillo submitted to Laser Works
4  for formatting and publication. In fact, he testified that March 29, 1999 was the "date where I
5  *announced* internally that it was available externally," which was posted on Cisco's website on
6  April 12, 1999. Dkt. 189-18 at 12:24-14:5.

## V. F5 OFFERS NO COMPELLING CHALLENGE TO RADWARE'S MOTION ON THE CISCO DISTRIBUTED DIRECTOR AND THE BIG-IP (3-DNS) TEST-BEDS

F5's opposition to Radware's argument that the Test-Bed Systems which Dr. Alexander ███████████████████████, as a matter of law, constitute anticipatory prior art, also fails. Moreover, the conclusions drawn regarding the Test-Bed Systems' ability to perform LLB does not support and, in fact, contradicts F5's contentions that the 3-DNS and the Distributed Director products performed link load balancing back in 1999.

Radware's motion addressed the status of *Dr. Alexander's re-creations* of the 3-DNS ("3-DNS Test-Bed") and Distributed Director systems ("DD Test-Bed") (collectively, the "Test-Bed Systems" or "Systems") as anticipatory prior art. Because these Test-Bed Systems did not exist before the priority date of the Asserted Patents and were neither publicly known nor used to practice LLB, as a matter of law, they cannot constitute anticipatory prior art under 35 U.S.C. §102(a), (b). In its Opposition, F5 confirms that not all of the hardware and software components used to create the Test-Bed Systems were ever used together in the prior art (Opp. at 15:25-16:1), thereby conceding that neither the 3-DNS Test-Bed nor the DD Test-Bed actually existed before the priority date. In light of F5's concession, Radware's motion that the Test-Bed Systems are not prior art should be granted.

F5 now asserts that the purpose of these Test-Bed Systems was only to demonstrate that Dr. Alexander's use of them is evidence that the alleged prior art, the 3-DNS and Distributed Director systems, *could* have performed ISP link load balancing. Opp. at 16:1-2. But such "evidence" is not pertinent to the issue of invalidity. First, the 3-DNS Test-Bed and the DD Test-Bed are, at best, poor replicas of the 3-DNS and Distributed Director Systems, cobbled together

- 11 -

RADWARE'S REPLY ISO MSJ RE
INVALIDITY AFF. DEFENSE
CASE NO. 5:13-CV-02024 RMW

1  using, as F5 and Dr. Alexander readily admit, ███████████████████████

2  ███. It is thus undisputed that the Test-Bed Systems are not prior art since multiple components

3  did not exist in 1999.

4      Second, the Test-Bed Systems allegedly performed LLB but only after ████████

5  ████████████████████████████████████████████████████████████████

6  ████████████████████████ (and, as detailed in Radware's Opposition to F5's

7  Summary Judgment Motion, the attempt failed). ███████████████████████████

8  ███████████████████████████. *See* Dkt. 186-10 (Yellin Decl., Ex. 7) at 81:22-83:3.

9  █████████████████████████████████████████████████████████████████

10 █████████████████████████████████████████████████████

11 █████████. *See* Dkt. 186-24 (Rubin Report dated March 2, 2015) at ¶¶81-82.  F5 does not

12 dispute these deficiencies in the Test-Bed Systems ███████████████████████████.

13 And yet F5 proffers the "results" of Dr. Alexander's demonstrations as purported evidence of

14 what could have happened in 1999 on the 3-DNS and Distributed Director systems. But this is

15 insufficient. Indeed, *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK, 2012 U.S. Dist.

16 LEXIS 92314, *14-15 (N.D. Cal. July 3, 2012) (Koh, J.), a case cited by Radware but ignored by

17 F5, is directly on point. In *Apple,* Judge Koh held that a "post-hoc, reconstructed interpretation"

18 of how a system "*might* have been constructed" is not prior art. *Id.*  F5 does not address, much

19 less distinguish, why its Test-Bed Systems should be treated differently than those in *Apple.*

20 Because the Systems are not prior art, it would be extremely prejudicial to allow their admission

21 into evidence to show the capabilities of systems that were admittedly different insofar as they did

22 not include the LLB inventions of the Asserted Patents. Based on F5's new argument in its

23 Opposition as to the purpose of the Test-Bed Systems, Radware moves *in limine* to exclude such

24 improper evidence at trial. [6]

---

[6] Given that this issue has been fully presented in the context of this briefing, Radware submits that the Court, in the interest of judicial economy, should exclude this improper evidence as part of its Summary Judgment Order. However, should the Court prefer, Radware will file a separate motion *in limine* to exclude evidence of the Test-Bed Systems.

- 12 -

RADWARE'S REPLY ISO MSJ RE
INVALIDITY AFF. DEFENSE
CASE NO. 5:13-CV-02024 RMW

F5 next contends that Radware contradicts its own infringement position by arguing that the Test-Bed Systems cannot constitute anticipatory prior art because F5 has failed to show that they were actually known to be capable of ISP LLB or that they were used for those purposes. Opp. at 16-17.  F5 again misses the point.  F5's Accused Products infringe whether or not the relevant *module* is not enabled because the software responsible for that *module* is **_already present_** in the Accused Products as sold.  *See* Dkt. 179-04.  Because no modifications to the underlying source code are required to activate and/or enable the LLB functionality already present in F5's products, infringement occurs regardless of activation.  *See Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.,* 287 F.3d 1108, 1118 (Fed. Cir. 2002); *Finjan, Inc. v. Secure Computing Corp.,* 626 F.3d 1197, 1205 (Fed. Cir. 2010).  The Test-Bed Systems, on the other hand, are entirely different: the alleged ability to perform LLB was not present in the Test-Bed Systems as programmed at all.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  As a result, Radware's position with respect to infringement are entirely consistent with its positions with respect to the Test-Bed Systems not being prior art.

Finally, it should be noted that the ▮▮▮▮▮▮▮▮▮▮▮▮ claimed in the Asserted Patents, is potent evidence that the underlying products, in fact, did not have LLB capabilities in 1999.  For all of these reasons, Radware's motion should be granted.

## VI.  SUMMARY JUDGMENT SHOULD BE GRANTED WITH RESPECT TO PRIOR ART FOR WHICH F5 OFFERS NO EXPERT EVIDENCE OR OPINION

F5's silence on the issue of its thirty-five abandoned, alleged prior art references is deafening.  F5 has failed to stipulate that it will not rely upon these references at trial.  *Compare* Motion at 11-13 (chart of 35 alleged prior art references) *with* Opp. at 18.  Nor does F5 dispute that Dr. Alexander did not rely upon and, thus, did not present *any* expert analysis regarding any of the references and combinations identified in Radware's motion.

1    The half-hearted challenges F5 does muster all fail.  First, it complains that Radware's
2    motion for partial summary judgment to eliminate these abandoned prior art references should be
3    brought as a motion *in limine*.  However, tellingly, it offers no supporting authority. Opp. at 18.
4    Second, F5 argues that although the alleged prior art references are not mentioned in its expert's
5    report and even though "F5 might not raise such prior art at trial," it should still survive summary
6    judgment.  Opp. at 18.  This is meritless.  District courts grant summary judgment to patent
7    holders where the alleged infringer fails to produce expert testimony in support of its claim of
8    invalidity, because "where patent claims involve complex issues of technology, expert testimony
9    is required to aid the fact finder."  *Invista North America S.A.R.L. v. M & G USA Corp. et al.*, 951
10   F.Supp.2d 626, 652 (D. Del. 2013) (Robinson, J.); *cf. Proveris Scientific Corp. v. Innovasystems,*
11   *Inc.*, 536 F.3d 1256, 1267 (Fed. Cir. 2008) (affirming requirement of expert testimony to prove
12   invalidity where "th[e] subject matter [wa]s sufficiently complex to fall beyond the grasp of an
13   ordinary layperson"); *Alexsam, Inc. v. IDT Corp.,* 715 F.3d 1336, 1347-48 (Fed. Cir. 2013)
14   (where defendant bore burden of proving obviousness, rejecting argument that its failure to
15   introduce expert testimony should be excused; when the technology is complex, expert testimony
16   is required to explain what the prior art disclosed).

17   F5's reliance on *Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354 (Fed. Cir.
18   2012) is misplaced.  Opp. at 18.  Indeed, *Meyers* supports Radware's, not F5's, position.  There,
19   the Federal Circuit held that an expert's failure to use or rely upon previously disclosed prior art
20   limited the expert's testimony, but did not foreclose other witnesses from testifying about such
21   prior art at trial.  However, in doing so, the Court reasoned that because the "technology involved
22   is simple," the district court erred in excluding prior art that was disclosed in interrogatory
23   responses but not relied upon in an expert report. *Id.* at 1374.  In contrast, this case does not
24   involve "simple" technology: neither F5 nor Radware has questioned the complexity of LLB
25   technology.  Since the technology here is complex, requiring source code analysis and specific
26   configurations of devices within a computer network, summary judgment should be granted.

27   Finally, F5 has not disclosed *any* fact witnesses with personal knowledge of the alleged
28   art.  Had F5 done so, Radware would have deposed them to determine whether they were

competent technicians in the field with the requisite personal knowledge of a fact witness. *See* Fed. R. Civ. P. 701 (opinion testimony by lay witnesses).[7]  Here, F5 has identified no sponsoring witnesses through whom it proposes to introduce the alleged prior art or with sufficient personal knowledge to testify that F5 can meet each and every claim, when comparing the prior art with the Asserted Patents.  F5 has failed to identify *any* relevant expert or fact evidence which it can introduce at trial to carry its high burden of proving invalidity over these references.  Summary judgment is appropriate to streamline and to simplify this case.

## VII. CONCLUSION

For all the above reasons, Radware's Motion should be GRANTED.

Dated: July 7, 2015

Respectfully submitted,

McDERMOTT WILL & EMERY LLP

By: */s/ Fabio E. Marino*
Fabio E. Marino

Attorneys for Plaintiffs and Counterclaim-Defendants RADWARE, LTD. and RADWARE, INC.

---

[7] Radware also moves to preclude F5 from offering expert testimony, either directly or indirectly via opinion testimony from lay witnesses regarding complex and technical prior art which its expert witness Dr. Alexander failed to address in his expert report.

RADWARE'S REPLY ISO MSJ RE INVALIDITY AFF. DEFENSE
CASE NO. 5:13-CV-02024 RMW