UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RADWARE, LTD., et al., | Case No. 5:13-cv-02024-RMW |
| Plaintiffs, | **ORDER ON: (1) RADWARE'S MOTION TO STRIKE; (2) F5'S MOTION FOR JUDGMENT ON THE PLEADINGS; (3) F5'S MOTION TO AMEND INVALIDITY CONTENTIONS; (4) F5'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY; (5) RADWARE'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON INVALIDITY; (6) RADWARE'S MOTION FOR SANCTIONS; (7) RADWARE'S MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT; (8) F5'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT; (9) F5'S MOTION FOR SUMMARY JUDGMENT ON DAMAGES** |
| v. | |
| F5 NETWORKS, INC., | |
| Defendant. | |

<span style="color:red">**Redacted Public Version**</span>

Re: Dkt. Nos. 180, 182, 183, 187, 189, 190, 201, 207, and 212

Defendant F5 Networks, Inc. ("F5") and plaintiffs Radware, Inc. and Radware Ltd. (collectively "Radware") bring the following motions: (1) Radware's Motion to Strike, Dkt. No. 201; (2) F5's Motion for Judgment on the Pleadings, Dkt. No. 180; (3) F5's Motion to Amend Invalidity Contentions, Dkt. No. 212; (4) F5's Motion for Summary Judgment of Invalidity, Dkt.

United States District Court
Northern District of California

No. 183; (5) Radware's Motion for Partial Summary Judgment Motion Against F5's Affirmative Defense of Invalidity, Dkt. No. 189; (6) Radware's Motion for Sanctions, Dkt. No. 207; (7) Radware's Motion for Summary Judgment of Infringement, Dkt. No. 182; (8) F5's Motion for Summary Judgment of Non-Infringement, Dkt. No. 190; and (9) F5's Motion for Summary Judgment on Damages Issues, Dkt. No. 187. The court has reviewed the papers filed and heard the argument of counsel. The court rules on the motions as set forth below.

## I.     BACKGROUND

### A.  Asserted Patents

Radware brings this patent infringement action against its competitor F5, alleging infringement of claims 1–7, 9–19, and 21–32 of U.S. Patent No. 8,266,319 ("'319 Patent") and claims 1–4, 6–12, 14, and 15 of U.S. Patent No. 8,484,374 ("'374 Patent") (collectively "Asserted Patents").[1] Both Asserted Patents are entitled "Load Balancing" and relate to "computer networks in general, and in particular to load balancing client requests among redundant network servers in different geographical locations." '319 col.1 ll.13–16; '374 col.1 ll.17–20. The '374 Patent is a continuation of the '319 Patent. The '374 Patent shares the same specification as the '319 Patent, other than the "Summary" section.

The technology at issue relates to link load balancing in a multi-homed environment. A "multi-homed" network is a network with multiple connections to the Internet. '319 col.15 ll.34–37. "Link load balancing" is a process for allocating network communications across these connections.

The Asserted Patents relate to techniques and systems for selecting a specific route from the multi-homed network to the Internet and from the Internet into the multi-homed network. The claimed inventions describe both "outbound" and "inbound" link load balancing. Outbound link load balancing deals with requests sent from a host that are destined for an external network via

---

[1] Radware previously asserted infringement of claims 1, 2, 6–9, 13 and 14 of U.S. Patent No. 6,665,702 ("'702 Patent"), but the court granted F5's motion for summary judgment of non-infringement of the '702 Patent. *See* Dkt. No. 145.

the Internet. Inbound link loading involves inbound requests for services received by the host via the Internet. Claims 24-28 of the '319 Patent are directed to outbound link load balancing. Claims 1-23 and 29-32 of the '319 Patent and all claims of the '374 Patent are generally directed to inbound link load balancing.

The Asserted Patents claim link load balancing as both a method and system. Representative Claim 26 of the '319 Patent describes a method for outbound link load balancing:

> 26. A method for routing data via a network from a first node to a second node, said network having a plurality of available routes from said first node to said second node and the plurality of routes are assigned with respective IP addresses, said method comprising the steps of:
>
> > selecting one of said routes for sending data between the first node and the second node on the basis of costing information of said respective routes;
> >
> > receiving a packet having a source IP address; and
> >
> > translating the source IP address to an IP address corresponding to the selected route of the plurality of routes.

Representative Claim 13 of the '319 patent describes a method for inbound link load balancing:

> 13. A method for managing a computer network having a device connected to the Internet through a plurality of routes, wherein the plurality of routes are assigned with respective IP addresses, comprising:
>
> > receiving a DNS[2] resolution query from a remote computer for a domain name within the computer network;
> >
> > selecting one of a plurality of routes connecting said device to the Internet in accordance with one or more criteria of the plurality of routes;
> >
> > responding to the DNS resolution query with an IP address associated with the selected route, said IP address is used for resolution of said domain name, receiving a packet having a destination IP address corresponding to one of the plurality of routes; and
> >
> > translating the destination IP address to an IP address within the computer network.

**B.  Accused Products**

Radware accuses F5's "BIG-IP Application Delivery Controller" of infringement. Specific

---

[2] DNS is an acronym for "Domain Name System." *See, e.g.*, Dkt. No. 179-26 ¶ 51.

5:13-cv-02024-RMW
ORDER ON MOTIONS FOR SUMMARY JUDGMENT

accused models are listed at Dkt. No. 182 at 10 n.4. F5's BIG-IP device is ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Dkt. No. 179-4 at 10 (citing Stamm Rep.). The

infringement issues focus on three modules within the TMOS: the Link Controller, Local Traffic

Manager ("LTM"), and Global Traffic Manager ("GTM"). *Id.* at 10-11. All three ████████████

████████████████████████ must be activated through the purchase of a license from F5. *Id.*

at 11. "LTM's primary functionality is local server load balancing, not ISP load balancing. In

particular, an LTM can sit between a local network and the internet, and control the routing of

incoming messages to different servers." Dkt. No. 184-4 (Brewer Decl.) ¶ 8. "GTM's primary

functionalities are to provide DNS-related services and global server load balancing ('GSLB').

DNS services relate to responding to client requests for IP addresses associated with a domain

name (e.g., 'Amazon.com')." *Id.* ¶ 9.

F5 acknowledges that the Link Controller's "primary purpose is to provide, in part, ISP

link load balancing functionality." Dkt. No. 190 at 3. However, in December 2014 F5

implemented a "hotfix" that made certain changes to its source code for the LTM, GTM and Link

Controller that, according to F5, █████████████████████████████████

██████████████████████████████████████████ *Id.* at 4; *see*

*also* Dkt. No. 188-6 (Thornewell Decl.) ¶ 11. Since removing the Link Controller load balancing

functionality, F5 has ██████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ Brewer Decl. ¶ 16.

## C.  Procedural History

The court previously held a joint *Markman* hearing in this case and in the related case

*Radware v. A10*, 13-cv-2021, on April 8, 2014 and issued its Claim Construction Order on April

18, 2014. Dkt. No. 122. The court also considered motions for summary judgment related to claim

construction issues in May 2015, and issued an order on the motions on June 11, 2014. Dkt. No.

United States District Court
Northern District of California

145. The parties in the A10 case filed a Joint Notice of Settlement on August 29, 2014.

13-cv-2021, Dkt. No. 252.

Having held a hearing on July 24, 2015, the court addresses the parties' various motions: (1) Radware's Motion to Strike, Dkt. No. 201, F5's Motion for Judgment on the Pleadings, Dkt. No. 180, and F5's Motion to Amend Invalidity Contentions, Dkt. No. 212; (2) F5's Motion for Summary Judgment of Invalidity, Dkt. No. 183, and Radware's Motion for Partial Summary Judgment Motion Against F5's Affirmative Defense of Invalidity, Dkt. No. 189; (3) Radware's Motion for Sanctions, Dkt. No. 207; (4) Radware's Motion for Summary Judgment of Infringement, Dkt. No. 182, and F5's Motion for Summary Judgment of Non-Infringement, Dkt. No. 190; and (5) Motion for Summary Judgment on Damages Issues, Dkt. No. 187.

## II.  RADWARE'S MOTION TO STRIKE PORTIONS OF F5'S MOTION FOR MOTION FOR JUDGMENT ON THE PLEADINGS, SUMMARY JUDGMENT OF INVALIDITY, AND DECLARATION OF DR. ALEXANDER IN SUPPORT THEREOF

Radware moves to strike: (1) F5's motion for judgment on the pleadings; (2) those portions of F5's motion for summary judgment of invalidity that rely on Global Server Load Balancing ("GSLB"); (3) those portions of F5's motion for summary judgment of invalidity that rely on Border Gateway Protocol ("BGP"); and (4) the May 28, 2015 declaration of Dr. Peter Alexander submitted in support of F5's motion for summary judgment of invalidity. Dkt. No. 201.

### A.  F5's Motion for Judgment on the Pleadings and its Section 101 Invalidity Defense

Radware moves to strike F5's motion for judgment on the pleadings on the basis that F5 failed to disclose 35 U.S.C. § 101 subject matter ineligibility as a basis for finding the Asserted Patents invalid in its invalidity contentions. *Id.* at 1.

F5 served its preliminary invalidity contentions on September 30, 2013, Dkt. No. 189-9, and, after obtaining the court's leave, *see* Dkt. No. 157, served amended invalidity contentions on May 16, 2014, Dkt. No. 189-10. The preliminary invalidity contentions state only that: (1) several asserted claims are invalid under 35 U.S.C. § 101 for mixing statutory claim classes, Dkt. No. 189-9 at 59 n.1, and that because discovery had then only recently commenced, it was at that time

1    "premature for F5 to determine whether there are issues related to . . . improper inventorship [and]

2    derivation under 35 U.S.C. § 101/102(f)." *Id.* at 59. F5's amendments did not add any invalidity

3    contentions related to Section 101. Only after Radware filed the instant motion to strike F5's

4    Section 101 invalidity defense did F5 move to amend its invalidity contentions to include the

5    defense of lack of subject matter eligibility. Dkt. No. 212.

6            Under Patent L.R. 3-3(d), a party's invalidity contentions must disclose "[a]ny grounds of

7    invalidity based on 35 U.S.C. § 101 . . . of any of the asserted claims." "Any invalidity theories

8    not disclosed pursuant to Local Rule 3-3 are barred, accordingly, from presentation at trial

9    (whether through expert opinion testimony or otherwise)." *MediaTek Inc. v. Freescale*

10   *Semiconductor, Inc.*, Case No. 11-5341, 2014 WL 690161, at *1 (N.D. Cal. Feb. 21, 2014)

11   (citation omitted). This District's patent local rules are designed "to balance the right to develop

12   new information in discovery with the need for certainty as to the legal theories." *O2 Micro Int'l*

13   *Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1366 (Fed. Cir. 2006). The rules accomplish

14   this by requiring parties to "provide early notice of their . . . invalidity contentions, and to proceed

15   with diligence in amending those contentions when new information comes to light in the course

16   of discovery." *Id.* at 1365–66. As Judge Grewal stated in a recent decision denying a motion for

17   judgment on the pleadings for failure to disclose Section 101 invalidity as required by Patent L.R.

18   3-3, "[t]his district's patent rules only work if there are consequences for failing to comply." *Good*

19   *Technology Corp. v. MobileIRON, Inc.*, Case No. 12-5826, Dkt. No. 298 at *3 (N.D. Cal. May 4,

20   2015).

21          F5 does not dispute that it failed to disclose Section 101 as an invalidity theory as required

22   under the Patent Local Rules. Rather, F5 argues that the court should deny Radware's motion to

23   strike F5's Section 101 defense because: (1) the defense is based on new legal authority developed

24   within the last year, subsequent to the Supreme Court's decision in *Alice Corp v. CLS Bank Int'l*,

25   134 S. Ct. 2347 (2014); and (2) the defense is not based on claim construction or fact issues

26   subject to discovery, so Radware will not suffer any prejudice should the court permit F5's

27   Section 101 defense. Dkt. No. 213 at 2. Neither argument is persuasive.

28

United States District Court
Northern District of California

6

1    As to the first, F5 waited too long following *Alice* to seek amendment of its invalidity

2    contentions to assert a Section 101 defense, and an intervening district court application of *Alice*

3    does not constitute sufficient change in the law to permit amendment so late in the case.

4    Intervening change in the law can constitute good cause to amend invalidity contentions. F5 cites

5    a decision from the Central District of California permitting the amendment of claims in light of

6    *Alice*. Dkt. No. 213 at 3. However, the defendant in that case served its amended invalidity

7    contentions on August 15, 2014, less than two months following *Alice*. *See Mortgage Grader, Inc.*

8    *v. Costco Wholesale Corp.*, Case No. 13-0043, Dkt. No. 97 at 2 (C.D. Cal. Oct. 27, 2014). Here,

9    F5 waited far longer—nearly a year—before filing its motion for judgment on the pleadings

10   asserting invalidity under Section 101. In addition, the issue of what constitutes patentable subject

11   matter has been hotly debated since the Federal Circuit's 2013 en banc decision in *CLS Bank*

12   *Intern. v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269 (Fed. Cir. 2013), *aff'd*, 134 S. Ct. 2347 (2014).

13   F5 also bases its motion on *Intellectual Ventures v. JP Morgan Chase & Co.*, Case No. 13-

14   3777, 2015 WL 1941331 (S.D.N.Y. April 28, 2015). *See* Dkt. No. 180. According to F5,

15   *Intellectual Ventures*, as "the first post-*Alice* decision addressing patentability of networking

16   methods and technologies," constitutes "intervening law" which supports late amendment to assert

17   a Section 101 defense. Dkt. No. 213 at 3. However, *Intellectual Ventures* is not controlling

18   authority: *Alice* marked the shift in Section 101 invalidity analysis; *Intellectual Ventures* merely

19   applied *Alice* to the field of networking methods and technologies. Accordingly, *Intellectual*

20   *Ventures* does not constitute the kind of "intervening law" that would support amendment at this

21   late hour. As Radware notes, the defendant in *Good Technology* submitted the *Intellectual*

22   *Ventures* decision in support of its motion for judgment on the pleadings asserting a previously

23   undisclosed Section 101 defense. *See Good Technology Corp.*, Case No. 12-5826, Dkt. No. 281-1.

24   Despite the *Intellectual Ventures* decision being even more recent at that point than it is now,

25   Judge Grewal nonetheless refused to excuse noncompliance with the Patent Local Rules and allow

26   a previously undisclosed Section 101 theory. *See id.*, Dkt. No. 298.

27   As to F5's second argument, the court need not reach the question of prejudice to Radware

28

7

5:13-cv-02024-RMW
ORDER ON MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1   because F5 has not shown good cause to permit amendment of its invalidity contentions. Patent

2   L.R. 3-6 provides for amendment of invalidity contentions "only by order of the Court upon a

3   timely showing of good cause." "[G]ood cause requires a showing of diligence," and it is the

4   movant's burden to establish diligence. *O2 Micro*, 467 F.3d at 1366. As discussed above, F5 has

5   not shown diligence, so the court need not consider the prejudice to Radware that would flow from

6   F5's untimely assertion of a Section 101 invalidity theory.

7       Radware's motion to strike F5's motion for judgment on the pleadings is GRANTED, and

8   F5's motion for judgment on the pleadings is DENIED. For the same reasons, F5's motion to

9   amend its invalidity contentions to add Section 101 subject matter ineligibility as a defense is

10  DENIED.

11       **B.  Global Server Load Balancing and Cisco DistributedDirector**

12      Radware also moves to strike those portions of F5's motion for summary judgment of

13  invalidity that rely on Global Server Load Balancing ("GSLB") because F5 failed to disclose

14  GSLB as prior art in its invalidity contentions as required by Patent Local Rule 3-3(c). Dkt. No.

15  201 at 3.

16      F5 does not dispute that the term GSLB does not appear in its invalidity contentions but

17  states that its summary judgment motion of invalidity is based on a specific embodiment of GSLB,

18  Cisco's DistributedDirector ("Cisco DD"), not the general concept of GSLB itself. Dkt. No. 213 at

19  4. According to F5, all aspects of GSLB relied upon in its summary judgment motion are

20  disclosed by Cisco DD, and Cisco DD forms the entire basis for its analysis regarding invalidity

21  based on GSLB. *Id*. at 5. F5 asserts that it both identified and charted Cisco DD as invalidating

22  prior art in both its preliminary invalidity contentions and in Dr. Alexander's invalidity report. *Id*.

23  at 6.

24      Radware, while acknowledging that Cisco DD was previously disclosed, nevertheless

25  argues that "any argument that GSLB, other than [Cisco DD], constitutes invalidating prior art

26  should be stricken," and that F5 "should be precluded from referring to GSLB functionality as

27  invalidating prior art, whether or not it is a functionality performed by [Cisco DD]." Dkt. No. 224

28

8

United States District Court
Northern District of California

1  at 5. However, Radware leaves unrebutted F5's contention that Cisco DD is a specific

2  embodiment of GSLB and cites no authority for precluding mention of GSLB as implemented in

3  Cisco DD. While some of the language in F5's motion does imply that GSLB systems other than

4  Cisco DD also constitute anticipating prior art, *see, e.g.*, Dkt. No. 183 at 14 ("The asserted claims

5  are invalid based on GSLB systems, such as the Cisco DistributedDirector . . . ."), Radware

6  identifies no portion of F5's motion for summary judgment of invalidity that relies on an aspect of

7  GSLB not disclosed by Cisco DD.

8         Accordingly, because F5's motion for summary judgment is based on Cisco DD, rather

9  than GSLB generally, and Cisco DD was previously disclosed as allegedly anticipating prior art,

10  Radware's motion to strike those portions of F5's motion based on GSLB is DENIED.[3]

11         **C.  Border Gateway Protocol**

12         Radware moves to strike those portions of F5's motion for summary judgment of invalidity

13  that rely on BGP because F5 failed to disclose BGP as prior art in its invalidity contentions. Dkt.

14  No. 201 at 3.

15         Like GSLB, BGP is a general protocol, rather than a specific implementation or

16  embodiment. However, whereas F5's motion for summary judgment makes clear that Cisco DD is

17  a specific implementation of GSLB and that Cisco DD itself is the prior art reference upon which

18  its invalidity theory is based, F5 does not dispute that it failed to disclose BGP as a prior art

19  reference and has not identified a specific BGP reference. Instead, F5 argues that BGP was

20  discussed in both parties' expert reports, and that Radware cannot claim that it will suffer any

21  undue prejudice from its consideration as prior art. Dkt. No. 213 at 7. F5 states that its summary

22  judgment motion regarding BGP is "based entirely on Radware's expert's own admissions from

23  his April 17, 2015 deposition," and that "[p]rior to conducting the deposition, F5 could not have

24  anticipated that Dr. Rubin would make these admissions, and thus could not have presented them

25

26  _____

[3] To be clear, F5 would not be able to assert another embodiment of GSLB as anticipating prior art
27  at trial, nor would it be able to simply argue that GSLB, unmoored from its implementation in
Cisco DD, anticipates.

28                                         9

1    in its contentions." *Id*.

2        F5 does not explain precisely how the testimony of Dr. Izhak Rubin, Radware's technical

3    expert, somehow enabled its BGP invalidity argument.[4] Based on F5's argument, it appears that

4    F5 either: (1) knew BGP was anticipating prior art before Dr. Rubin's deposition but chose not to

5    disclose it as a prior art in its invalidity contentions, perhaps because before Dr. Rubin's alleged

6    admissions F5 felt it was an argument not worth making; or (2) F5 was aware of BGP but unaware

7    that it was an anticipating prior art reference until Dr. Rubin's deposition. Whatever the case, F5

8    has not shown good cause to excuse its failure to comply with Patent Local Rule 3-3(c). F5 cites

9    no authority for the proposition that an opposing expert's admissions can constitute good cause to

10   allow the assertion of previously undisclosed prior art, and even if it could, F5 has not explained

11   how Dr. Rubin's alleged admission somehow rendered BGP anticipating prior art that F5 could

12   not have discovered in an earlier diligent search. This is particularly true in light of the fact that

13   F5's expert discussed BGP in his expert report.

14       As with F5's Section 101 invalidity argument, because F5 has not shown good cause

15   amend its invalidity contentions, the court need not reach the question of prejudice.

16   ―――――――――――――――――

17   [4] Dr. Rubin's expert report regarding BGP in full states that:

18       37.    A number of the systems and references that Dr. Alexander relies on relate
         to Border Gateway Protocol (BGP), or require BGP; a technology unrelated to the
19       Radware Patents. The link load balancing systems and methods disclosed in the
         Radware Patents do not relate to BGP. The solutions taught by the Radware
20       Patents for inbound and outbound link load balancing were devised as an
         improved solution to multihoming [rather] than BGP. During prosecution, the
21       patent applicants made clear that the multihoming solution described by the
         Radware Patents did not relate to BGP:

22           Additional, other prior art submitted in an IDS currently with this
             preliminary amendment describes a multi-homed environment,
23           which is based on BGP. The BGP mechanism fails to suggest the
             feature of the applicant's claimed invention of resolving a DNS
24           resolution query in the context where the device is connected to the
             Internet through a plurality of routes and the plurality of routes are
             assigned with respective IP addresses.
25

26       38.    Thus, from the outset, the patent applicants distinguished their load
         balancing solution from BGP. Dr. Alexander's reliance on BGP is misplaced
         because Radware's solution solves a multihoming problem in a different way.

27   Dkt. No. 213-2 at ECF p.4.

28                                          10

F5's invalidity contentions do not disclose BGP as anticipating prior art as required under Patent Local Rule 3-3, and F5 has not shown good cause to amend its invalidity contentions. Radware's motion to strike those portions of F5's motion for summary judgment of invalidity based on BGP is therefore GRANTED.

### D.  May 28, 2015 Supplemental Declaration of Dr. Alexander

Finally, Radware moves to strike the supplemental declaration of F5's expert, Dr. Alexander. Dkt. No. 201 at 12. Radware argues that in his supplemental declaration Dr. Alexander provides additional opinions regarding the Cisco DD system that were not provided in his expert report as required by Rule 26. Dr. Alexander provided his expert report on invalidity on January 20, 2015. In it, he identified and explained the Cisco DD test-bed system he had created as a demonstration that Cisco DD anticipates the Asserted Patents. On March 2, 2015 Dr. Rubin provided his rebuttal expert report on invalidity, pointing out what are, in his opinion, flaws with the test-bed system. Specifically, Dr. Rubin opines that: (1) the test bed was not connected to the Internet, as required by the claims; (2) certain components of the test bed (a networking switch and configuration files) were not in existence as of the priority date of the patents; and (3) the test bed system, as configured by Dr. Alexander, still could not perform inbound or outbound link load balancing as required by the asserted claims. Dkt. No. 189-29 ¶¶ 96-109. Radware contends that because Dr. Alexander created the test-bed, he had all of the evidence at his disposal when he wrote his initial expert report. Dkt. No. 201 at 13. According to Radware, to allow Dr. Alexander's supplemental declaration would prejudice Radware by permitting F5 an improper rebuttal to Dr. Rubin's rebuttal.

F5 contends that the supplemental declaration contains no new opinions, but rather simply addresses the purported flaws with the test-bed system, which are simply factual issues raised by Radware. Dkt. No. 213 at 8. F5's position is that an expert cannot be reasonably expected to anticipate every counterargument that could possibly be made and preemptively discuss them in his report. *Id.* Moreover, F5 argues that Radware has had substantial opportunity to conduct discovery into these alleged flaws, including deposing Dr. Alexander about the substance of the

United States District Court
Northern District of California

11

1   declaration.

2       The court agrees with F5. Radware identifies no prejudice other than the general assertion

3   that "it would prolong Radware's day in Court and the cessation of F5's infringing conduct." Dkt.

4   No. 201 at 14. Moreover, the court agrees that an expert cannot reasonably be expected to

5   anticipate every criticism and argument that an opposing expert will level, and preemptively

6   respond to each and every one. Finally, the court notes that Radware cites no authority in support

7   of its argument, beyond citing Rule 26 itself. Accordingly, the court DENIES Radware's motion

8   to strike the supplemental declaration. However, F5 cannot offer new opinions of Dr. Alexander

9   that go beyond merely responding to Dr. Rubin's criticisms of the test bed systems.

10  ### III.   THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY AND TO DISMISS F5'S INVALIDTY AFFIRMATIVE DEFENSES

11      Each party moves for summary judgment regarding invalidity. F5 moves for summary

12  judgment that the asserted claims are invalid as anticipated by prior art GSLB and BGP, or, in the

13  alternative, that the asserted claims are obvious in light of those references. Dkt. No. 183. Radware

14  moves for partial summary judgment against F5's affirmative defense of invalidity on the grounds

15  that F5 has failed to demonstrate that the asserted references constitute invalidating prior art. Dkt.

16  No. 189.

17  ### A.  Legal Standard

18      Summary judgment is proper where the pleadings, discovery, and affidavits demonstrate

19  that there is "no genuine issue as to any material fact and that the moving party is entitled to

20  judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S.

21  317, 322 (1986). At the summary judgment stage, the Court "does not assess credibility or weigh

22  the evidence, but simply determines whether there is a genuine factual issue for trial." *House v.*

23  *Bell*, 547 U.S. 518, 559–60 (2006). Material facts are those which may affect the outcome of the

24  case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is

25  genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving

26  party. *Id.*

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

Patents are presumed to be valid. 35 U.S.C. § 282(a). However, an invention is not patentable if "(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States" or if "(e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent . . . ." 35 U.S.C. § 102(a), (b), (e) (2006). A party challenging the validity of a patent bears the burden of proving invalidity by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).

### B.  Prior Art References

Radware moves for partial summary judgment that: (1) F5 abandoned a number of prior art references previously cited in its invalidity contentions; (2) the "test-bed" systems created by F5 are not prior art; (3) the Maki-Kullas patent is not prior art; and (4) the Cisco DistributedDirector White Paper ("DD white paper") is not prior art. *See* Dkt. No. 189. The court first addresses the allegedly abandoned prior art references and test-bed systems before turning to the Maki-Kullas patent and the DD white paper.

### 1.  Abandoned Prior Art References

Radware first moves for partial summary judgment on twenty-six alleged anticipating prior art references and nine alleged obviousness combinations. *Id*. at 11. Radware argues that despite identifying these prior art references and combinations in its invalidity contentions, F5's expert failed to offer any opinions based on these references. *Id*. The result, according to Radware, is that F5 has no evidence in support of its claim that these references and combinations invalidate the Asserted Patents, and therefore Radware is entitled to partial summary judgment that these unsupported references do not invalidate the Asserted Patents. *Id*. at 13.

13

F5 does not dispute that Dr. Alexander did not rely or offer an opinion on these references but argues that "a district court should not exclude prior art evidence simply because such evidence is not in an expert's report." Dkt. No. 196-4 at 18 (citing *Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354 (Fed. Cir. 2012)). F5 agrees that it may not raise such prior art at trial through expert testimony but argues that regardless of whether F5 intends to use the twenty-six prior art references and nine combinations, there is no basis for granting summary judgment in Radware's favor.

F5 has not necessarily abandoned the asserted prior art references by failing to introduce any expert opinions based on these references. *See In re Brimonidine Patent Litig.*, 643 F.3d 1366, 1376 (Fed. Cir. 2011) ("There is no invariable requirement that a prior art reference be accompanied by expert testimony."). Accordingly, Radware's motion for summary judgment that F5 abandoned the prior art references on which it did not offer an expert opinion is DENIED. However, Radware may move to exclude these references if F5 later seeks to introduce them through lay witness testimony, should the particular references F5 seeks to introduce contain matter that is complex and requires expert testimony to explain. *See, e.g., Alexsam, Inc. v. IDT Corp.,* 715 F.3d 1336, 1347-48 (Fed. Cir. 2013). In addition, Radware may move to limit the number of prior art references asserted as anticipating or as part of an obviousness combination.

### 2.   Cisco and BIG-IP Test-Bed Systems

Radware also moves for partial summary judgment that F5's Cisco DD and BIG-IP test-bed systems do not anticipate or render obvious the asserted claims as a matter of law. Dkt. No. 189 at 14. Radware advances two arguments: (1) the test-bed systems did not exist as configured before the priority date of the patents because they incorporate components and configuration files that did not exist as of the priority date of the patents; and (2) the test-bed systems were not known or used to practice link load balancing before the priority date of the patents. *Id.* However, F5 appears to agree with Radware that the test-bed systems, rather than the underlying 3-DNS and DistributedDirector products, are not prior art. *See* Dkt. No. 196-4 at 16 ("F5 has never asserted that all of the components of the Test-Bed System were used together in the prior art. Instead, the

1    Test-Bed System simply evidences that the prior art 3-DNS and DistributedDirector systems could

2    perform ISP load balancing."). Accordingly, because it is undisputed that the test-bed systems are

3    themselves not prior art, Radware's motion for summary judgment that the test-bed systems

4    neither anticipate nor render obvious the asserted claims is GRANTED.[5]

5                    **3.  The Maki-Kullas Patent**

6            Radware moves for summary judgment that the Maki-Kullas patent is not prior art. *See*

7    Dkt. No. 189. The Maki-Kullas patent, filed on October 5, 1999, pre-dates the December 20, 1999

8    effective filing date of the '319 (and '374) patents.[6] However, the person "who first conceives,

9    and, in a mental sense, first invents . . . may date his patentable invention back to the time of its

10   conception, if he connects the conception with its reduction to practice by reasonable diligence on

11   his part, so that they are substantially one continuous act." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d

12   1572, 1577 (Fed. Cir. 1996) (internal quotation marks and citation omitted). Accordingly, to

13   overcome the Maki-Kullas prior art reference, Radware must demonstrate that it conceived of the

14   inventions disclosed in the '319 and '374 patents prior to the Maki-Kullas priority date, October 5,

15   1999, and diligently reduced the inventions to practice after conception.[7] Radware asserts that the

16   invention disclosed in the '319 and '374 patents was conceived by April 1, 1999, and reduced to

17   practice at least as early as October 4, 1999. Dkt. No. 186-4 at 17–19.

18           Although F5 has the burden of establishing invalidity, Radware has the burden of proving

19   that it conceived of the alleged inventions before the filing date of the patent application and

20   _____

21   [5] In its reply, Radware also moved *in limine* to exclude the use of the test-bed systems as
     demonstrative evidence that the prior art 3-DNS and Cisco DD systems could perform ISP load
22   balancing. Dkt. No. 209 at 12. However, the court disagrees with Radware that the issue has been
     fully presented in the context of this briefing, and declines to reach the issue at this juncture.

23   [6] The '319 Patent was filed on June 2, 2003, but it enjoys the filing date of December 20, 1999,
     because the '319 patent is a division of application No. 09/467,763 (now Patent No. 6,665,702).
24   Dkt. 24 at Ex. B. The '374 Patent was filed on August 3, 2012, but also enjoys the filing date of
     December 20, 1999, because it is a continuation of the '319 Patent application filed on June 2,
25   2003, which in turn is a division of application No. 09/467,763, filed on December 20, 1999. *See
     id.* at Ex. C.

26   [7] F5's expert, Dr. Alexander, conceded that the Maki-Kullas patent is Section 102(e) art and thus
     not entitled to a priority date earlier than its October 5, 1999 filing date. Dkt. No. 189-7 at 163;
27   Dkt. No. 186-10 at 160:15–161:6.

28
     5:13-cv-02024-RMW
     ORDER ON MOTIONS FOR SUMMARY JUDGMENT

diligently reduced the inventions to practice. *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1322 (Fed. Cir 2013) ("After an accused infringer has put forth a prima facie case of invalidity, the burden of production shifts to the patent owner to produce sufficient rebuttal evidence to prove entitlement to an earlier invention date."). To do so, Radware must corroborate its alleged conception and reduction to practice dates.  *Spectralytics, Inc. v. Cordis Corp.*, 576 F. Supp. 2d 1030, 1045-46 (D. Minn. 2008), *aff'd*, 649 F.3d 1336 (Fed. Cir. 2011) ("The patentee must do more than offer some evidence (such as an affidavit) supporting his pre-patent application invention date; the patentee must offer ***corroboration*** of that invention date.") (emphasis in original). "The issue of the conception date of an invention is a legal conclusion based on underlying factual findings." *Taurus IP*, 726 F.3d at 1322.

### a.  Conception

Radware asserts that the invention disclosed in the '319 and '374 patents was conceived by April 1, 1999, *see* Dkt. No. 186-4 at 17–19, and offers the following evidence in support of this date:

5:13-cv-02024-RMW
ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1 ████████████████████████████████████████████

2 ████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ████████████████████████████████

5 █ ████████████████████████████████████████████████

6 ████████████████████████████████████████████

7 ████████████████████████████████████████████

8 ████████████████████████████████████████████

9 ████████████████

As an initial matter, Dr. Rubin's expert testimony is based solely on his review of "the inventor testimony and various documents cited and referenced in the depositions." *Id*.[8] Radware does not specifically identify the documents reviewed by Dr. Rubin, but the documents appear to include only the above inventor testimony and the ████████████████. As a result, Dr. Rubin's expert testimony adds nothing beyond the inventor testimony in this case, and does not constitute evidence of conception. *See Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005) (rejecting expert testimony in support of conception that simply pointed to the inventor's notebook and concluded that various entries demonstrated conception without providing any further explanation).[9]

_____

[8] Dr. Rubin's full conception opinion states:



[9] Radware's attempt to distinguish *Invitrogen* fails. *See* Dkt. No. 209 at 5. The court's discrediting of the proffered expert testimony in that case was not due to the fact that the inventor's notebook entries contradicted his deposition testimony, as Radware claims. *Id*. Rather, the court found that "Clontech nowhere provides the court with expert testimony that properly explains the technical notebook entries advanced in support of its conception arguments." *Invitrogen*, 429 F.3d at 1068. The expert's declaration in *Invitrogen* provided the court "no substantive factual guidance," as the

17

United States District Court
Northern District of California

1    What this leaves is the testimony of Zisapel and Peles, co-inventors of the Asserted

2 Patents, and the email from Zisapel to Fuks, who is also a co-inventor of the asserted patent. The

3 testimony of Zisapel and Peles cannot alone show conception, and must be corroborated. *See, e.g.,*

4 *Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373, 1382 (Fed. Cir. 2002) ("It is well established that a

5 party claiming his own prior inventorship must proffer evidence corroborating his testimony.").

6 When evaluating corroboration, courts apply a "rule of reason" that examines "all pertinent

7 evidence so that a sound determination of the credibility of the inventor's story may be reached."

8 *Coleman v. Dines*, 754 F.2d 353, 360 (Fed. Cir. 1985). Although under a rule of reason analysis

9 all the pertinent evidence is considered, it "does not dispense with the requirement for some

10 evidence of independent corroboration." *Coleman*, 754 F.2d at 360. Corroboration of inventor

11 testimony requires evidence beyond an inventor's own statements and documents. See *Hahn v.*

12 *Wong*, 892 F.2d 1028, 1032 (Fed. Cir. 1989) ("the inventor . . . must provide independent

13 corroborating evidence in addition to his own statements and documents."); *Golden Bridge Tech.*

14 *Inc. v. Apple*, Inc., Case No. 12-4882, 2014 WL 1928977, at *4 (N.D. Cal. May 14, 2014)

15 ("[E]vidence of conception and reduction to practice must be 'independently corroborated' beyond

16 the inventor's own statements and documents, and must be 'evidence that would be available to a

17 jury' to support its factual positions.") (internal quotation marks and citation omitted).

18    Even viewing all of Radware's proffered evidence together, the court cannot conclude that

19 Radware has sufficiently proven its entitlement to a conception date of ███████. To the

20 extent that Radware's proffered ████████████████████

21 ███████████████████████████████████ A jury

22 could reasonably conclude that Radware had not conceived of the invention by ███████, and

23 the court finds that there is a genuine issue of fact as to the conception date of the inventions

25 expert stated only that "It is clear from [the inventor's] testimony and his lab records that he
conceived of the invention in 1984." *Id.* Like Dr. Rubin, the expert in *Invitrogen* cited various

26 documents (in that case, notebook entries), and concluded that "[t]hese representative entries
demonstrate Goff's conception, diligence and reduction to practice." *Id.* The court found that "such

27 wholly conclusory assertions on a legal issue cannot carry [a party's] burden on summary
judgment," and the court so finds in this case as well.

United States District Court
Northern District of California

disclosed in the '319 and '374 patents.

### b. Reduction to Practice

Radware asserts that the inventions disclosed in the '319 and '374 patents were reduced to practice at least as early as October 4, 1999, one day prior to the filing date of the Maki-Kullas patent. *See* Dkt. No. 186-4 at 17–19. Although the court found that Radware has not proven its claimed conception date of ███████, because an inventor cannot reduce to practice an invention of which he has not conceived, the court proceeds to examine whether Radware can demonstrate that the inventions disclosed in the '319 and '374 patents were reduced to practice by October 4, 1999. Proof that the inventions were reduced to practice by October 4, 1999 would also serve as proof that the invention was conceived prior to the filing date of the Maki-Kullas patent, and therefore that the '319 and '374 patents claim priority over the Maki-Kullas patent.

Radware offers the following evidence in support of its claimed reduction to practice date:

- Radware press release issued on or about October 4, 1999 announcing LinkProof as "the first IP load balancing solution for networks with multiple ISP connections." *See* Dkt. No. 189-6.

- Testimony of co-inventor Peles. ████████████████████████ ████████████████. Dkt. No. 186-9 at 84:14–18.[10]

To demonstrate actual reduction to practice,[11] a party must show that the inventor: (1) constructed an embodiment or performed a process that met all the claimed limitations; and (2) determined that the invention would work for its intended purpose. *Z4 Technologies, Inc. v.*

---

[10] Radware also offers the expert testimony of Radware's technical expert, Dr. Rubin. Dkt. No. 186-4 at 19. However, this testimony does not constitute evidence of reduction to practice for the same reason Dr. Rubin's conception opinion failed to do so: Dr. Rubin merely cites Radware's other evidence, without adding any substantive analysis or explanation, before stating his conclusory opinion that after ████████████████████████████████████ ████████████████. Dkt. No. 186-24, ¶ 40.

[11] The parties agree that Radware constructively reduced the invention to practice on December 20, 1999, the date on which it filed the '702 patent application. *See* Dkt. Nos. 189 at 19; 196-4 at 7.

5:13-cv-02024-RMW
ORDER ON MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

*Microsoft Corp.*, 507 F.3d 1340, 1352 (Fed. Cir. 2007) (citing *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998)); *see also Estee Lauder Inc. v. L'Oréal, S.A.*, 129 F.3d 588, 592–95 (Fed. Cir. 1997) (holding that reduction to practice does not occur until inventor knows embodiment will work for its intended purposes). Like conception (and diligence in reducing an invention to practice), inventor testimony of reduction to practice must be corroborated. *In re NTP*, 654 F.3d 1279, 1291 (Fed. Cir. 2011) ("An inventor cannot rely on uncorroborated testimony to establish a prior invention date . . . . It has long been the case that an inventor's allegations of earlier invention alone are insufficient—an alleged date of invention must be corroborated.) (citations omitted); *Cooper*, 154 F.3d at 1330 ("In order to establish an actual reduction to practice, an inventor's testimony must be corroborated by independent evidence."). Courts apply a rule of reason approach to the question of reduction to practice, but as with conception, "evidence of corroboration must not depend solely on the inventor himself." *Id.* at 1330.

Radware argues that Peles' testimony is corroborated by the LinkProof press release, which Radware argues is direct, independent, and contemporaneous evidence of the claimed October 4, 1999 date. Dkt. No. 209-4 at 6–7. However, Peles' testimony is limited to the assertion that October 4, 1999 was the earliest date for which evidence of reduction to practice could be found. *See* Dkt. No. 186-9 at 84:14–18 ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ It does not appear that Peles affirmatively testified that October 4, 1999 was the date by which Radware had reduced its invention to practice. The court therefore finds that his testimony does not constitute evidence of Radware's claimed date for reduction to practice.

The question of whether Radware reduced the invention disclosed in the '319 and '374 patents to practice by October 4, 1999 therefore largely hinges on the LinkProof press release. Because the court finds that Radware has not established as undisputed that the press release was issued on October 4, 1999, the court finds the press release insufficient to demonstrate reduction to practice. Radware asserts in its motion for summary judgment that the press release was issued

20

"on or about" October 4, 1999. Dkt. No. 185-4 at 3. While the press release itself includes the date "October 4, 1999," the document produced by Radware also contains the following handwritten notation: "Issued Oct 1999." Dkt. No. 189-6 at ECF p. 2. Radware produces no corroborating evidence that the press release was actually issued on October 4, 1999. In its reply, Radware argues that the document speaks for itself, and is consistent with the testimony of others who recall that the LinkProof product was being offered for sale at least by October 4, 1999. Dkt. No. 209-4 at 6–7. However, the testimony Radware cites does not necessarily support a publication date of October 4, 1999. Radware first cites the deposition testimony of Zack Cherkassy,[12] who testified that ████████████████████████████████████████████████████ ██████████████████ Dkt. 209-12 at 37:19. But Radware does not explain how Cherkassy's recollection that LinkProof was *released* in September or October, 1999 is consistent with its contention that LinkProof was *announced* on or around October 4, 1999, and the press release to that effect. Radware also cites Dr. Rubin's supplemental declaration, in which he opines that ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████ Dkt. No. 210-11, ¶ 6. The court fails to see how Dr. Rubin's supplemental declaration helps establish that Radware issued the press release on October 4, 1999.

In sum, the court finds that a reasonable juror, based on the evidence provided by Radware, could conclude that the invention disclosed in the '319 and '374 patents was not reduced to practice by October 4, 1999. Although Radware has submitted some evidence that it reduced the invention to practice in October, 1999, there is a genuine issue of fact as to whether it did so by October 4, 1999.

Because the court finds that Radware has not conclusively shown that it either conceived of the invention disclosed in the '319 and '374 patents by April 1, 1999, or that Radware reduced

---

[12] In its administrative motion seeking leave to file portions of its reply brief under seal, Radware identifies Cherkassy as "an engineer at Radware who offered testimony regarding the conception and reduction to practice of the claimed inventions." Dkt. No. 209-1 at 2.

5:13-cv-02024-RMW
ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1   its invention to practice by October 4, 1999, the court hereby DENIES Radware's motion for

2   summary judgment that the Maki-Kullas patent is not prior art as a matter of law.[13]

3                       **4.   Cisco DistributedDirector White Paper**

4          Finally, Radware moves for summary judgment that both versions of the Cisco DD white

5   paper produced by F5 are not prior art. Dkt. No. 189 at 19–22. Two versions of the of the DD

6   white paper have been produced in discovery: (1) a version bearing a "1999" copyright notice

7   which was authenticated by its author, Kevin Delgadillo (the "'99 DD white paper"); and (2) a

8   second version, which apparently has not been authenticated, and which bears a copyright date of

9   1997 (the "'97 DD white paper"). *See* Dkt. Nos. 189-15, 186-13. F5 asserts that both documents

10  are anticipating prior art references and support a finding that the '319 and '374 patents are invalid

11  for obviousness.

12         The parties' dispute regarding the '99 DD white paper largely concerns whether F5 has

13  shown that it was published prior to April 1, 1999—the date by which Radware contends the

14  inventions disclosed in the '319 and '374 patents were conceived. However, as discussed above,

15  Radware has not shown that the Asserted Patents are necessarily entitled to a priority date of April

16  1, 1999. F5 has introduced evidence that the '99 DD white paper was released at least sometime in

17  April of 1999, and possibly in March of that year: (1) the document bears a "1999" copyright on

18  every page, and bears the notation "3/99" on the final page, which Cisco employee and author of

19  the document Kevin Delgadillo testified indicates the document was available publicly in March

20  1999, *see* Dkt. No. 189-18 at 17:19–18:22; and (2) Delgadillo testified that the document was

21  published to the Cisco website in March 1999 (or, at the latest, April 1999), Dkt. No. at 3:16–18,

22  11:23–12:2, 13:11–24; and 16:3–15. Accordingly, the court finds that there is a genuine issue of

23  fact as to the publication date of the '99 DD white paper, and DENIES Radware's motion for

24  summary judgment that the '99 DD white paper is not prior art as a matter of law.

25

26  [13] As the court concludes that Radware has failed to show that it reduced the inventions disclosed
    in the '319 and '374 patents to practice by October 4, 1999, the court need not reach the parties'
27  arguments regarding diligence.

28                                            22

The second version, the '97 DD white paper, bears a "1997" copyright on each page, but has not been authenticated by Delgadillo. This version is also "mutilated," according to Radware, in that it has several blank spaces throughout. Dkt. No. 209-4 at 9. Radware contends that the court should grant summary judgment that this version is not prior art because there is no evidence in the record that the document was ever publicly available. However, although it is currently unauthenticated and F5 chose not to depose Delgadillo about the document, Radware provides no reason to preclude F5 from potentially introducing the document as evidence on the basis of Delgadillo's trial testimony. Moreover, Radware concedes the '99 and '97 documents contain some of the same material, *see* Dkt. No. 186-4 at 22, which, along with the "1997" copyright date, at least raises an issue of fact as to the document's authenticity and publication date. Accordingly, the court DENIES Radware's motion for summary judgment that the '97 DD white paper is not prior art as a matter of law.

### C. Anticipation

F5 moves for summary judgment of invalidity, arguing that all asserted claims of both the '319 and '374 patents are invalid as anticipated by Cisco DD. Dkt. No. 183 at 14–20.[14] For the reasons set forth below, the court finds that F5 has not shown by clear and convincing evidence that Cisco DD anticipates the asserted claims, and that a reasonable jury could find that the Cisco DD system does not disclose ISP link load balancing. Accordingly, F5's motion for summary judgment that the asserted claims are invalid as anticipated by Cisco DD is DENIED.

#### 1. Legal Standard

A claim is anticipated under § 102, and thus invalid, "if each and every limitation is found either expressly or inherently in a single prior art reference." *Bristol–Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001) (internal quotation marks and citation omitted); *accord Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, 471 F.3d 1369, 1375 (Fed. Cir.

---

[14] F5 also moves for summary judgment that the asserted outbound claims in both patents are invalid as anticipated by BGP. Dkt. No. 183 at 20–21. However, because the court granted Radware's motion to strike those portions of F5's motion for summary judgment that rely on BGP, F5's motion for summary judgment that BGP anticipates is DENIED.

2006). Put simply, "[t]hat which infringes, if later, would anticipate, if earlier." *Peters v. Active Mfg.*, 129 U.S. 530, 537 (1889) (internal quotation mark omitted). To show anticipation under 35 U.S.C. § 102, the moving party must "identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference." *Schumer v. Lab. Computer Systems, Inc.*, 308 F.3d 1304, 1315–16 (Fed. Cir. 2002). A reference can also anticipate "if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).

Anticipation under § 102 is a two-step inquiry. *See Medichem, S.A. v. Rolabo, S.L.*, 353 F.3d 928, 933 (Fed. Cir. 2003). The first step is claim construction. *Id.*; *see Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("'claim must be construed before determining its validity just as it is first construed before deciding infringement.'" (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 996 n.7 (Fed. Cir. 1995) (Mayer, J., concurring), *aff'd*, 517 U.S. 370 (1996)). The second step is a comparison of the properly construed claim to the prior art. *Medichem*, 353 F.3d at 933.

### 2. Analysis

The Court previously construed the claims in its claim construction order. *See* Dkt. No. 122. As relevant here, the Court construed the following terms:

| Claim Language | Construction |
|---|---|
| "[one load balancing] criterion" and "one or more criteria" | A standard on which a decision about load balancing may be based, such as hops, latency, TTL, cost, link pricing, load on the route, data content, data packet loss, availability, current load, round robin, or random. |
| Multi-homed [network] | A network that has two or more connections to the Internet at a single geographic location, each through a discrete ISP link. |
| A plurality of routes | Two or more pathways connecting a source and a destination. For claims 24-28 of the '319 Patent, the source is 'the client computer network' and the destination is 'the remote server computer.' For the '374 Patent and claims 1-23 and 29-32 of the '319 Patent, the source is the 'remote computer' and the destination is the 'device' or 'system' in the 'computer network' or 'multi-homed network.' |

United States District Court
Northern District of California

| [Internet Service Provider (ISP)] Links | A pathway connecting to or from an ISP. |
|---|---|
| Configured to | Programmed to [perform certain functions].<br>This does not require user intervention if the feature claimed is included in the product as supplied. |

The asserted claims in this case comprise two types: claims that are directed to selecting a route for inbound messages from a remote computer to the multi-homed network (claims 1–23 and 29–32 of the '319 patent and claims 1–4, 6–12, and 14–15 of the '374 patent),  and those directed to selecting one of multiple routes for outbound messages, where the client computer is located on a multi-homed network and is sending communications out to a remote server (claims 24–28 of the '319 patent). *See* Dkt. No. 122 at 17–19. The inbound claims all contain a multi-homing limitation, a limitation for resolving a DNS query from a remote computer for a domain name within the multi-homed network, and, critically, a limitation for selecting one of a plurality of routes through one of the ISPs to send a response to the DNS query. Some inbound claims also include a limitation that the route selection be based on one or more metrics or criteria, such as latency, hops, costing, load, or data packet loss.[15] Finally, some of the inbound claims contain a limitation requiring the translation of IP addresses for packets received on the multi-homed network to an IP address within that network, known as network address translation ("NAT" or "NATing"). Like the inbound claims, each outbound claim contains a multi-homing limitation and the limitation of selecting one of the plurality of routes. However, for the outbound claims, the client is located at the multi-homed network and is sending packets to a remote server. Additionally, the outbound claims include the limitation that route selection must be based on costing information of the routes and NATing. Although F5 contends that Cisco DD/GSLB anticipates all asserted claims, the court discusses the inbound claims before turning to the outbound claims.

---

[15] The court previously construed "Proximity/proximities" to mean "a measurement or measurements based on hops, latency, TTL, or a combination thereof." Dkt. No. 122 at 6. The court also construed "Costing information" and "cost" as "plain and ordinary meaning [but] not limited to monetary price." *Id*. at 25-26. The court observed that "cost" "can represent an array of non-monetary resources. Something can 'cost' bandwidth or be expensive in terms of time." *Id*. at 26.

### a. Inbound claims

F5 contends that Cisco DD anticipates all inbound claims of the '319 and '374 patents as it discloses each limitation required by the inbound claims. Radware disputes that Cisco DD meets the route selection limitation, and argues that the prior art does not disclose "route metrics" with regard to dependent claims, but otherwise does not dispute that Cisco DD discloses the other inbound claim limitations. *See* Dkt. No. 202-4.

### i. Route Selection Limitation

Each claim requires the selection of either "one of a plurality of routes" connected to the internet (in the case of the '319 patent) or the selection of "one ISP link from the plurality ISP links" (for the '374 patent). The court previously construed ISP link to mean "a pathway connecting to or from an ISP." Dkt. No. 122 at 20. The court stated that an "ISP link" is a subpart of a "route," *id*. at 21, and the parties treat the route selection limitations of the two patents as functionally equivalent in the context of this motion.

In its reply, F5 concedes that GSLB did not select between different routes having the same destination, but rather between routes that had different destinations. Dkt. No. 211 at 6. ("Radware's argument essentially boils down to the fact that prior art GSLB selected between routes had different destinations, not a single destination. This is true . . . ."). F5 argues that this is a distinction without a difference: "[t]he concept of choosing a server based on well-known route metrics for GSLB is the same as choosing a route based on the same metrics for ISP link load balancing." Dkt. No. 183 at 15. Furthermore, F5 argues that it has introduced direct evidence that Cisco DD was *capable* of comparing various routes to the same destination, and that it had been sold for that purpose. *Id*. According to F5, the result is that Cisco DD discloses the route selection limitation required by the asserted inbound claims.

F5's evidence consists of the expert testimony of Dr. Alexander and his demonstration Cisco DD test-bed, and the witness testimony of Kevin Delgadillo and Dean Darwin. Dkt. No. 183 at 15. Dr. Alexander opined that "The [Cisco] DD System was capable of receiving a DNS resolution query from a remote computer for a domain name within the enterprise LAN computer

5:13-cv-02024-RMW
ORDER ON MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

network, selecting one of the plurality of routes connecting said device to the Internet, and responding to the DNS resolution query with an IP address associated with the selected route." Dkt. No. 183-11 ¶ 173. According to Dr. Alexander, Cisco DD systems available as early as December 1998 "provided a plurality of routes for an enterprise Local Area Network ("LAN") to connect to the Internet such that each of the plurality of routes could be assigned ISP specific IP addresses." *Id*. ¶ 163. According to Dr. Alexander, Cisco DD can allocate each ISP "a virtual IP address from its pool of addresses so as to uniquely identify the respective ISPs." *Id*. ¶ 183. Dr. Alexander explains that he was able to configure Cisco DD to perform the role of "a network controller receiving a DNS resolution query from a remote computer," *id*. ¶ 181, and to "respond to the DNS query with one of a plurality of the virtual IP destination addresses associated with each of the respective ISP links." *Id*. ¶ 184. Furthermore, his configuration of the Cisco DD system can "select, based on at least one load balancing criterion, one ISP link from the plurality ISP links." *Id*. F5 further supports its argument with witness testimony. First, Kevin Delgadillo testified that Cisco DD could accomplish ISP load balancing, and was likely used for that purpose. Dkt. No. 183-5 at 41:18–23. Second, Dean Darwin, a former Cisco employee, testified that he sold Cisco DD in 1997 and 1998 "to balance between [] ISP links" as an ISP link load balancing solution. Dkt. No. 183-10 at 257:10–258:19.

Radware disagrees with F5's analysis, and contends that GSLB, and by extension Cisco DD, "uses a routing protocol that does not consider multiple candidate routes to a destination for the purpose of providing load balancing among associated attached ISP links." Dkt. 195-1 at ¶ 6. According to Radware, this means that GSLB/Cisco DD chooses the best server, not necessarily the best route. Dkt. No. 202-4 at 17. Radware argues that the fundamental difference between prior art GSLB systems like Cisco DD and inbound ISP LLB as claimed by the '319 and '374 patents is that inbound LLB does not make a selection between different destination servers; rather, the destination server remains the same, and the LLB system chooses the route (or ISP link) used to reach that server. *Id*. at 18. Furthermore, Radware's expert takes issue with several aspects of the test-bed system, and contends that it fails to show that Cisco DD discloses the

27

1  limitations of the asserted inbound claims.

2          The court finds that F5 has not shown by clear and convincing evidence that the Cisco DD

3  system anticipates the asserted inbound claims. First, while Delgadillo does testify that Cisco DD

4  could accomplish "ISP load balancing," he also testified that he was "not aware of" any Cisco

5  products, including the Cisco DistributedDirector, that would "enable a company or enterprise to

6  do link load balancing." Dkt. No. 203-6 at 31:2-32:11. Delgadillo also testified that Cisco "never

7  marketed Distributed Director as a link load balancing solution." *Id.* at 41:25-42:10. In his

8  testimony, Delgadillo distinguishes between "ISP load balancing" and "link load balancing," a

9  distinction which F5 does not explain. Second, Darwin testified that he sold Cisco DD for the

10  purpose of providing ISP redundancy: "the ability to move traffic if . . . an ISP was failing or

11  failing to provide the performance, if it was slow or if it was congested or it was overused, to be

12  able to balance between the ISP links." Dkt. No. 183-10 at 257:16–20. While his testimony may

13  provide some support for F5's position, he does not testify as to how Cisco DD "moved traffic"

14  between links, and whether it did so by performing route selection akin to that taught by the

15  Asserted Patents.

16          Finally, the parties have provided conflicting expert testimony on whether the test-bed

17  system demonstrates the ability to perform inbound ISP link load balancing. While Dr. Alexander

18  asserts that his test-bed system demonstrates Cisco DD is capable of performing ISP link load

19  balancing, Dr. Rubin opines that even if all components of the Cisco DD System had pre-dated the

20  priority date of the patents-in-suit,[16] the Cisco DD System still would not anticipate because the

21  system could not perform either inbound or outbound link load balancing. Dkt. No. 186-24 at ¶¶

22  97–109.[17] Both experts appear to present reasonable analyses of whether the Cisco DD system

23  anticipates the asserted inbound claims software, and reach opposite conclusions. Summary

24  judgment is therefore improper. *Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 322–32.

---

[16] The parties dispute the relevance of the presence of a networking switch in the test-bed system, as well as configuration files written by Dr. Alexander in 2014.

[17] In fact, Dr. Rubin testified that GSLB cannot even perform outbound *server* load balancing, let alone link load balancing. Dkt. 195-1 ¶ 6.

28

United States District Court
Northern District of California

### ii.   Route Metrics Limitation

F5 also asserts that the inbound dependent claims are anticipated because such dependent claims require route metrics and such route metrics were known in the prior art and not invented by Radware. The inbound dependent claims all require either that the route selection be: (1) "based on the proximity determination"; or more generally (2) "in accordance with one or more criteria of the plurality of routes." *See, e.g.*, '319 col.19 ll.35–36, 64–66. Although F5 argues that Cisco DD included the use of various metrics, including availability, proximity, and latency, Dkt. No. 183 at 18, Radware correctly notes that F5 fails to prove that such route metrics were used by a "device for managing a computer network, said device connected to the Internet through a plurality of routes," wherein that device then "select[s] the one of the plurality of routes" for purposes of link load balancing in a multi-homed environment, Dkt. No. 202-4 at 19. For each type of criterion or metric required by the asserted claims, F5 simply notes that Cisco DD "includes" that criterion or metric, but does not "explain in detail how each claim element is disclosed in the prior art reference." *Schumer*, 308 F.3d at 1315–16.

### b.   Outbound Claims

The parties' arguments regarding the outbound claims mirror those advanced for the inbound claims. F5 states that like with the inbound claims, "as the outbound claims recite nothing more than these known GSLB techniques applied in the context of multi-homed networks, they are invalid." Dkt. No. 183 at 20. Radware argues that "the outbound claims have a multi-homing route selection limitation that is not met by GSLB." Dkt. No. 202-4 at 20.

The outbound claims require route selection in a multi-homing network environment like the inbound claims, with the difference that the client, not the server, is located at the multi-homed network and is sending packets to a remote server, rather than a remote client. Accordingly, the court finds that for the reasons discussed above in connection with the inbound claims, F5 has not shown by clear and convincing evidence that Cisco DD anticipates the outbound claims. The outbound claims all also require the use of costing information, and for the same reasons stated in the court's discussion of route metrics for inbound claims, the court finds that F5 has not

29

1    explained in detail how Cisco DD discloses the use of costing information in the context of the

2    asserted outbound claims.

3         In sum, the court finds that F5 has failed to carry its burden of showing by clear and

4    convincing evidence that each limitation in the asserted claims is disclosed in a single prior art

5    reference, Cisco DD. The court therefore DENIES F5's motion for summary judgment that the

6    Asserted Patents are invalid as anticipated under 35 U.S.C. § 102.

7         **D.  Obviousness**

8         The final issue to resolve is whether the asserted claims are obvious in light of the prior art.

9    A patent is obvious if "the differences between the subject matter sought to be patented and the

10   prior art are such that the subject matter as a whole would have been obvious at the time the

11   invention was made to a person having ordinary skill in the art to which said subject matter

12   pertains." 35 U.S.C. § 103(a). *See also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).

13   What a particular reference discloses is a question of fact, *see Para–Ordnance Manufacturing,*

14   *Inc. v. SGS Importers International, Inc.,* 73 F.3d 1085, 1088 (Fed. Cir. 1995), as is the question

15   of whether there was a reason to combine certain references, *see Transocean Offshore Deepwater*

16   *Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1303 (Fed. Cir. 2010). Under the

17   four part test for obviousness detailed in *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1,

18   17-18 (1966), the court must consider (1) the scope and content of the prior art; (2) the difference

19   between the prior art and the claimed invention; (3) the level of ordinary skill in the art; and (4)

20   any objective evidence of nonobviousness. The party asserting invalidity bears the burden of

21   proving "by clear and convincing evidence that a skilled artisan would have been motivated to

22   combine the teachings of the prior art references to achieve the claimed invention, and that the

23   skilled artisan would have had a reasonable expectation of success in doing so." *Procter &*

24   *Gamble Co. v. Teva Pharmaceuticals USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (quoting

25   *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007)).

26        The scope and content of the prior art is set forth above. The parties agree on the level of

27   ordinary skill in the art. *See* Dkt. No. 183 at 21 n.12. Radware has submitted evidence on objective

28

30

1    indicia of nonobviousness.[18] Although F5 relies on both GSLB/Cisco DD and BGP in support of

2    its obviousness arguments, the court granted Radware's motion to strike those portions of F5's

3    motion for summary judgment that rely on BGP. The court therefore does not consider F5's

4    arguments based on BGP.

5          F5 asserts that all the core networking technology functionality of the claims existed in the

6    prior art, and that to repurpose those principles and apply them in multi-homing network use cases

7    proposed by its customers, rather than in a geographically distributed server network, is nothing

8    more than an application of well-known networking techniques that would have been obvious to a

9    person of ordinary skill in the art. Dkt. No. 183 at 21. In support of its obviousness argument, F5

10   offers the testimony of Kevin Delgadillo and Dean Darwin that GSLB could potentially be

11   repurposed for ISP link load balancing, as well as its assertion that Radware "directly lifted source

12   code from its GSLB product, WSD, for inclusion in its ISP link load balancing product." *Id.* at 21–

13   22. F5 does not offer any expert testimony regarding obviousness.

14         Radware's expert disputes F5's contention, opining that the "core networking

15   functionality" that existed in the prior art does not disclose, teach, or suggest ISP load balancing.

16   Dkt. 195-1 ¶¶ 9-11. As discussed above, Radware maintains that GSLB server load balancing is

17   distinct from ISP load balancing. Dr. Rubin also opines that repurposing software modules is

18   common in the software development industry, as such modules are universally shared through

19   designs implemented by networking equipment, which has been done by F5 itself. *Id.* ¶ 12.

20         On this record, the court cannot say as a matter of law that it would have been obvious to

21   one of ordinary skill in the art to repurpose the existing "core networking technology" for use in a

22   multi-homing network environment. F5 bears the burden of showing by clear and convincing

23   evidence that it would have been within the skill of an ordinary artisan to do so, and F5 has not

24   met that burden. The evidence F5 does present is contradicted by Dr. Rubin's expert opinion, and

25   F5's cursory assertion that it would be obvious to repurpose "core networking technologies" and

26   —————————————————

27   [18] Because the court finds that F5 has not met its burden of showing obviousness by clear and
     convincing evidence, the court need not reach objective indicia of nonobviousness.

28

5:13-cv-02024-RMW
ORDER ON MOTIONS FOR SUMMARY JUDGMENT

apply them in a multi-homing network environment is insufficient to carry its burden on summary judgment. *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008) (a party must provide "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.") (citations and quotation marks omitted). Additionally, the court finds that inconsistencies among the expert testimony introduced by Radware and F5's evidence raise questions of credibility and weight. Therefore, issues of material fact remain with respect to obviousness. Accordingly, the court therefore DENIES F5's motion for summary judgment that the Asserted Patents are invalid as obvious under 35 U.S.C. § 103.

## IV.   RADWARE'S MOTION FOR SANCTIONS UNDER RULE 37

Radware moves to exclude two categories of evidence under Federal Rule of Civil Procedure 37 based on F5's alleged discovery violations: (1) evidence, especially source code, relating to F5's "hotfix" and (2) evidence relating to F5's February 2015 review of its "QK view" files. For the reasons explained below, the court DENIES the motion for sanctions.

### A.  Legal Standard

Under Rule 37(c)(1):

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Rule 26(e) requires a party to supplement its disclosures and discovery responses if it learns of additional or corrective information. Rule 37(c)(1) "gives teeth to these requirements by forbidding the use" of any information required to be disclosed by Rule 26(a) or (e) that is not properly disclosed. *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). Rule 37(c) provides a "self-executing, automatic sanction to provide a strong inducement for disclosure of material." *Id.* at 1107; *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008) ("Under Rule 37 exclusion of evidence not disclosed is appropriate unless the failure to disclose was substantially justified or harmless."). "Two express exceptions ameliorate the harshness of Rule 37(c)(1): The information may be introduced if the parties' failure to

32

United States District Court
Northern District of California

disclose the required information is substantially justified or harmless." *Yeti*, 259 F.3d at 1106. It is F5's burden to prove harmlessness or substantial justification. *Id.* at 1107.

The duty to disclose documents created after the close of discovery is not clear. *Tilton v. McGraw-Hill Companies, Inc.*, Case No. 06-0098, 2007 WL 3229157, at *2 (W.D. Wash. Oct. 30, 2007).

### B. F5's Hotfix

On November 4, 2014, F5 issued a "hotfix" to remove certain functionality in the accused devices, allegedly in order to ensure the accused devices did not infringe Radware's Asserted Patents. Radware asserts that F5 did not promptly disclose the hotfix and did not produce the source code underlying the hotfix. Dkt. No. 207 at 3-4.

This court issued its claim construction order on April 18, 2014. Dkt. No. 122. On November 4, 2014, Radware requested F5's counsel to supplement the source code of the accused products to the extent there were any material changes to the source code Radware had been provided to that point. Dkt. No. 207-2. On November 11, 2014 F5 responded that in lieu of producing the source code, Peter Thornewell, F5's 30(b)(6) witness on the technical operation of the source code, would testify as to any material changes at his deposition. Radware deposed Peter Thornewell on November 12, 2014, and he did not identify any material changes. On November 28, 2014, fact discovery closed. However, the parties stipulated that the deposition of certain witnesses, including Martin Brewer, could take place after the close of fact discovery due to scheduling issues. Dkt. No. 225-3 at 3. On December 4, 2014, the day before Brewer's deposition, F5 sent Radware an email stating that Brewer "will be prepared to give testimony regarding F5's recent 'End of Life announcement for inbound and outbound cost-based link load balancing and inbound link utilization-based load balancing,'" *i.e.* the hotfix. Dkt. No. 207-3. F5 also included a link to F5's public announcement of the hotfix dated December 4, 2014. *Id.*

On December 5, 2014, Brewer was deposed. *See* Dkt. Nos. 218-6, 218-7. Brewer testified about the how the BIG-IP accused products would function after the hotfix was implemented. Dkt. No. 218-7 at 240:20–241:21. He also testified to a limited extent as to how a customer could

33

receive a "patch" to re-enable the cost-based link load balancing but noted that F5 had not "quite figured through the details about who would be eligible and things like that." Dkt. No. 198-10 at 64:13–15. Brewer also "[did] not know" whether the hotfix included "any other features or fixes" beyond removing the cost-based link load balancing functionality. Dkt. No. 206-6 at 52:8–13. Brewer did not produce a copy of the source code for the hotfix or patch. Radware made no explicit request following Brewer's deposition to examine the source code until it filed the current motion for sanctions.

Radware served its opening expert report authored by Dr. Rubin on January 15, 2015. Dr. Rubin addressed the hotfix in his report, relying on Brewer's testimony and F5's public announcement. Dkt. No. 179-26 at ¶ 125, and n.56–58. Dr. Rubin was able to identify the specific functionalities that would be disabled by the hotfix: ████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████ *Id.* ¶ 129 (citing Brewer Dep.); *see also* ¶ 158 (effect of the hotfix on inbound claims). F5 disclosed the report of its expert, Dr. Peter Alexander, on March 2, 2015. He also discussed the hotfix. *See* Dkt. No. 218-8 at 173–179 (Section 6.3 The F5 Hotfix Configuration). His testimony was general and based upon information from F5's attorneys who presumably got the information from F5's engineers. The experts appear to agree that the hotfix ███████████████████████████████████ ██████████████████████████████████████████████████████ *Id.* at ¶ 494–95, citing Rubin Rep. at ¶ 158.[19]

On May 29, 2015 Mr. Thornewell submitted a declaration in support of F5's motion for summary judgment of non-infringement stating that he "designed much of the code for the 'hotfix,' which F5 implemented to disable certain functionalities relating to the ability of the products to distribute traffic across ISP links in a multi-homed environment." Dkt. No. 188-6 ¶ 3. Mr. Thornewell had not discussed the hotfix at his November 12, 2014 deposition.

---

[19] The experts disagree on whether the remaining functionality is infringing, as discussed below.

1       F5's disclosure of the hotfix was purportedly made as soon as it became available: the day

2   before Brewer's deposition. Although the timing of the disclosure of the hotfix appears suspicious,

3   there is no direct evidence that it was done to disadvantage Radware. F5 may not have produced

4   the source code because it did not believe it would be necessary to use the source code itself to

5   show non-infringement. Therefore, F5 may have assumed that Radware did not need or desire to

6   review the hot fix source code. Nevertheless, to avoid any possible prejudice, the court orders that

7   Radware be given the same opportunity to investigate the hotfix that it would have had if earlier

8   disclosure had been made. The court therefore orders F5 to make the relevant source code

9   available for Radware's review and to make Mr. Thornewell available for up to three hours of

10  deposition on the design and implementation of the hotfix. Additionally, the court finds that any

11  failure by F5 to supplement its disclosures and discovery responses is rendered harmless by this

12  order.

13          **C.  The QK View Files**

14      In support of F5's motion for summary judgment on damages issues, F5 refers to customer

15  configuration data found in F5's QK View files. The QK View files are diagnostic snapshots of

16  how a customer uses and configures F5's BIG-IP products. Dkt. No. 218-3 at 3. Oscar Brain, an

17  F5 witness, conducted three reviews of the QK View files: one in May 2014 and two in February

18  2015. Mr. Brain was deposed in October 2014 and testified about the May 2014 review, the

19  contents of the QK View files, and how reports are generated from the files. *See* Dkt. No. 218-4 at

20  3; Dkt. No. 225-5 at 2. Radware was not informed of the February 2015 reviews until F5 produced

21  Laura Stamm's expert report on damages.

22      In her expert report, Ms. Stamm uses the February 2015 customer configuration reports to

23  support her contention that there was no demand for the patentable feature of the accused LTM

24  and GTM products. Dkt. No. 184-14 ¶ 64. Radware was aware of the QK View database and the

25  information available within the database during the discovery period, and deposed an F5 witness

26  about the database. Radware also deposed Ms. Stamm about the QK View files. *See* Dkt. No.

27  218-12. However, Radware has not had the opportunity to examine the data underlying Brain's

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1 February 2015 configuration reports, which were created after the close of discovery.

2 Accordingly, fairness dictates that F5 produce the data underlying the February 2015 reports on

3 which Mr. Brain relied to create his February reports, and make Mr. Brain available for up to

4 three hours of deposition testimony directed only at the basis and preparation of the February 2015

5 reports.

6       Radware's motion for sanctions seeking exclusions of the source code for the hotfix and

7 the February 2015 QK View reports is DENIED subject to F5's production within thirty days or as

8 otherwise agreed by the parties of: (1) the hotfix source code; (2) a deposition of Thornewell not

9 to exceed three hours in length and limited to the design and implementation of the hotfix and

10 patch; (3) the underlying data supporting the 2015 QK view reports; and (4) three hours of

11 deposition from Mr. Brain concerning the creation of the February 2015 QK View reports.

12 **V.   THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT OF INFRINGEMENT**
**     AND NON-INFRINGEMENT**

13       Each party moves for summary judgment on infringement of various asserted claims.

14 Radware moves for summary judgment of infringement on claims 1, 2, 7, 10, 11, 12, and 24 of the

15 '319 Patent and claims 9, 10, and 12 of the '374 Patent. Dkt. No. 182. For the reasons set forth

16 below, Radware's motion is GRANTED for claim 24 of the '319 Patent for pre-hotfix products

17 but DENIED in all other respects.

18       F5 moves for summary judgment of non-infringement on five issues: (1) that F5 does not

19 directly infringe any of the asserted method claims;[20] (2) that F5's Local Traffic Manager,

20 standing alone, does not infringe any of the claims; (3) that the post-"hotfix" version of the LTM

21 does not infringe any of the asserted claims; (4) that the post-"hotfix" version of the Link

22 Controller does not practice claims 24–28 of the '319 Patent; and (5) that the post-"hotfix" version

23 of the Global Traffic Manager does not infringe claims 3–23, 29, 30, and 32 of the '319 Patent and

24 claims 5 and 13 of the '374 Patent. Dkt. No. 190. The court GRANTS F5's motion regarding: (1)

25

26 _____

27 [20] The asserted method claims are '319 Patent claims 13-23 and 26–28; '374 Patent claims 1–4
and 6–7.

28                         36

1   no direct infringement of method claims; and (2) no infringement by LTM standing alone. As to

2   the post-hotfix products, at the time the parties submitted their motions, F5 had not produced its

3   post-hotfix source code to Radware. The court therefore DENIES WITHOUT PREJUDICE F5's

4   motion for summary judgment of non-infringement regarding post-hotfix products. Nevertheless,

5   because the court will provide F5 with the opportunity to renew its motion once supplemental

6   discovery is complete, the court discusses several arguments raised in F5's motion below.

7       **A.  Legal Standard**

8       Summary judgment on infringement is a two-step analysis. "First, the claims of the patent

9   must be construed to determine their scope. Second, a determination must be made as to whether

10  the properly construed claims read on the accused device." *Pitney Bowes, Inc. v. Hewlett–Packard*

11  *Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999) (internal citation omitted). "[S]ummary judgment of

12  non-infringement can only be granted if, after viewing the alleged facts in the light most favorable

13  to the non-movant, there is no genuine issue whether the accused device is encompassed by the

14  claims." *Id.* at 1304.

15      **B.  Direct Infringement of Method Claims**

16      F5 moves for summary judgment of no direct infringement of the asserted method claims.

17  Radware, "to conserve judicial resources and simplify the case for trial, . . . agrees to not assert its

18  theories of direct infringement for the method claims." Dkt. No. 200-4 at 3 (Radware Opp. to F5

19  MSJ NonInf.). Accordingly, the court GRANTS F5's motion of no direct infringement of the

20  asserted methods claims: '319 Patent claims 13–23 and 26–28; and '374 Patent claims 1–4 and 6–

21  7.

22      **C.  *Finjan* and *Fantasy Sports***

23      Several of F5's arguments on infringement depend on how *Finjan, Inc. v. Secure*

24  *Computing Corp.*, 626 F.3d 1197 (Fed. Cir. 2010), and *Fantasy Sports Properties, Inc. v.*

25  *Sportsline.com, Inc.*, 287 F.3d 1108 (Fed. Cir. 2002), apply to the facts of this case. Having

26  reviewed the applicable case law, the court concludes that F5's accused BIG-IP products *may*

27  infringe the Asserted Patents if the products include programs that carry out, or are configured to

United States District Court
Northern District of California

28

37

carry out, the claims of the Asserted Patents.[21] As explained in more detail below, the BIG-IP

products may be infringing because applications configured to carry out the claimed functions are

preloaded onto the BIG-IP devices when sold, even though the applications must be enabled

before use.

In *Fantasy Sports* the Federal Circuit found that a fantasy football program infringed

claims directed to a system that awarded "bonus points." 287 F.3d at 1117-19. The accused

program was configurable to award bonus points, even though a user had to select various options

already present in the software to get the bonus points. The Federal Circuit explained:

> Although a user must activate the functions programmed into a piece of software by selecting those options, the user is only activating means that are ***already present in the underlying software.*** Otherwise, the user would be required to alter the code to enable the computer to carry out those functions. Accordingly, in order to infringe the '603 patent, the code underlying an accused fantasy football game must be written in such a way as to enable a user of that software to utilize the function of awarding bonus points for unusual plays such as out-of-position scoring, without having to modify that code. In other words, an infringing software must include the "means for scoring . . . bonus points" regardless whether that means is activated or utilized in any way.

*Id.* at 1118 (emphasis in original).

In *Finjan* the Federal Circuit evaluated claims of direct infringement by

> three accused computer security products: a 'Webwasher' software download, a 'Webwasher' hardware 'appliance' or server containing software, and a 'Cyberguard TSP' hardware appliance that also contains software. It is undisputed that all three products contain source code for eight software modules. Three of those modules— Anti-Virus, Anti–Malware, and Content Protection—offer proactive scanning functionality, in addition to other features. The eight modules are 'locked' when the three products are sold, requiring a customer to purchase a separate key to activate each individual module. Therefore, a customer who purchases an accused product can activate all, some, or none of the eight modules at different cost.

626 F.3d at 1201-02 (citations omitted). The Federal Circuit first analyzed the specific claim

language at issue:

---

[21] The court emphasizes that the products "may infringe" because the parties have not moved for summary judgment on all claims. Furthermore, as discussed below, the court grants summary judgment of non-infringement only as to certain claims.

5:13-cv-02024-RMW
ORDER ON MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1

> Finjan's non-method claims describe capabilities without requiring that any software components be "active" or "enabled." The system claims recite software components with specific purposes: "a logical engine *for preventing* execution", "a communications engine *for obtaining* a Downloadable", or "a linking engine ... *for forming* a sandbox package". . . . This language does not require that the program code be "active," only that it be written "for causing" a server or a computer to perform certain steps.

*Id.* at 1204 (citations omitted).

Applying the analysis from *Fantasy Sports*, the Federal Circuit found that the accused products, which contained the "software for performing the claimed functions" when sold, infringed the Asserted Patents. *Id.* at 1205. Specifically,

> The code for proactive scanning was 'already present' in Defendants' accused products when sold. There is no evidence that customers needed to modify the underlying code to unlock any software modules. The fact that users needed to 'activate the functions programmed' by purchasing keys does not detract from or somehow nullify the existence of the claimed structure in the accused software.

*Id.*

Here, the device claims, like those in *Fantasy Sports* and *Finjan*, describe the capability and configuration of the network controller. For example, claim 9 of the '374 Patent requires "[a] device for load balancing client requests among a plurality of internet service provider (ISP) links in a multi-homed network, comprising a network controller configured to resolve an incoming domain name server (DNS) query."

F5's arguments attempting to distinguish *Finjan* and *Fantasy Sports* are not persuasive. F5 argues that claims 1 and 24 of the '319 Patent and claim 9 of the '374 Patent "all require active, enabled functionality" to be infringed. Dkt. No. 198-14 (F5 Opp. to Radware MSJ Inf.) at 6. F5 is correct that the court must look to the specific claim language to evaluate infringement. Here, the claim language is not distinguishable from that in *Finjan*. First, *Finjan* did not turn on special means-plus-function language. F5 Opp. to Radware MSJ Inf. at 8. Second, the court has already held that the claims do not require active method steps; rather, the court held that to infringe, an accused product must be delivered configured to perform the claimed functions. *See* Dkt. No. 145 at 6–9.

The court previously held that the device claims were not invalid for improperly mixing statutory classes. The court rejected F5's argument that the functional language in the device claims called for an affirmative method step. Dkt. No. 145 at 6-9. The court found that "the claims at issue in this case recite a device or system with various components that perform specified functions. There is no confusion over when infringement occurs: "when one makes, uses, offers to sell, or sells the claimed apparatus: the [network controller.]" *Id.* at 9 (citing *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1277 (Fed. Cir. 2012)). The court also rejected F5's argument that "because the products as sold are not configured to perform the claimed functions" F5's products did not infringe. Dkt. No. 145 at 17.

The cases that F5 cites in opposition, *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316 (Fed. Cir. 2001) and *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376 (Fed. Cir. 2011) are distinguishable from the instant case because the accused devices there were not actually configured to perform the claimed functions, but were only capable of being configured (i.e., programed) to perform the claimed functions. *Telemac*, 247 F.3d at 1330 ("[T]hat a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement. In this case, due to a restriction built into the software program stored in the telephone's memory, a user of Topp's system is prevented from directly placing international calls.") (citation omitted); *Typhoon*, 659 F.3d at 1380 ("The district court construed the claim as requiring that a device, to be covered by the claim, actually performs, or is configured or programmed to perform, each of the functions stated in the claim," in contrast to merely having "the capability of being configured or programmed to perform the stated function, although not so structured in the device provided by a defendant.").

The court's construction of "configured" captures this distinction. The court previously construed the term "configured to" to mean "'programmed to [perform certain functions.]' This does not require user intervention if the feature claimed is included in the product as supplied." Dkt. No. 122 at 21. The court noted:

> In general, the court agrees with Radware that "configured to" does not require user activation, but does require "that the claimed feature

40

be included in the software." Dkt. No. 136 (Radware Br.) at 13 (*citing Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002)). Thus, merely being "capable of" performing a function is not enough, but if a device comes programmed with specific claimed functions it falls within the claims.

*Id.* at 22.

Thus, like in *Fantasy Sports*, F5's products infringe if they contain code "written in such a way as to enable a user of that software to utilize the [claimed] function . . . without having to modify that code." 287 F.3d at 1118. What cases like *Fantasy Sports, Finjan,* and *Typhoon Tech* recognize is that nearly all computers can be programed to perform claimed software functions. A computer with a memory, keyboard, display, and processor is "capable" of being "configured" to carry out infinite software functions. However, selling such a computer does not constitute infringement if the purchaser is the one who has to program the computer to carry out the claimed functions. If the infringer, on the other hand, sells a computer preloaded with infringing software code, the computer is "configured," or "operable," to perform the claims, and may be infringing under *Finjan* and *Fantasy Sports. Cf. Nazomi Comm., Inc. v. Nokia Corp.*, 739 F. 3d 1339, 1346 (Fed. Cir. 2014) ("[T]he structure (*i.e.,* JTEK software) necessary to enable Jazelle hardware to process stack-based instructions (*i.e.,* Java bytecodes) is not only inactive, it is not even present on the accused products. The installation of JTEK software is not unlocking existing functionality, but adding new functionality not currently present. There is no infringement.")

Here, F5 does not dispute that the BIG-IP products are sold and delivered to customer with ███████████████████████████ preloaded, although not accessible until licensed. *See* Dkt. No. 200-4 (Radware Opp. to F5 MSJ NonInf.) at 4. Accordingly, if the software preloaded onto the BIG-IP products is configured to perform the claimed functions, the BIG-IP products may be infringing. The court now turns to the parties' arguments regarding infringement of specific claims.

### D. Outbound Link Load Balancing: '319 Patent claims 24–28

Independent claim 24 of the '319 Patent recites (emphasis added):

24. A routing device for routing data via a network from a first node to a second node, said network having a plurality of available routes

41

from said first node to said second node and the plurality of routes are assigned with respective IP addresses, said routing device comprising:

a route selector operable to select one of said routes for sending data between said first node and said second node *on the basis of costing information of said respective routes*; and

a network address translator operable to receives a packet having a source IP address and translating the source IP address to an IP address corresponding to the selected route of the plurality of routes.

The court construed "costing information" as having its "plain and ordinary meaning, not limited to monetary price." Dkt. No. 122 at 25–26.

### 1.  Pre-hotfix: '319 Patent Claim 24

Radware moves for summary judgment of infringement of claim 24 of the '319 Patent. F5's non-infringement argument is that the Local Traffic Manager ("LTM") "standing alone" is not capable of infringing the "costing information" element. Dkt. No. 190 (F5 MSJ NonInf.) at 8. F5 notes that Radware's expert cites to Link Controller and GTM functionality to support his infringement opinion. *Id.* At the hearing on this motion, F5 emphasized that whether or not LTM "alone" infringes the Asserted Patents was relevant to the parties' damages analysis. F5 specifically sought a determination from the court that LTM alone does not infringe. The court notes that whatever effect LTM versus LTM plus other modules has on the parties' damages opinions is not relevant to the infringement question. In any event, Radware has not shown that LTM "alone" infringes the Asserted Patents. All of the outbound claims at issue require load balancing based on cost. The documents that Radware points to suggesting the LTM can load balance do not support a finding that LTM can load balance *based on cost*. Dkt. No. 200-3 at 7–8. For example, the "BIG-IP Local Traffic Manager Implementations" document only states that, after following various set-up steps, "the virtual server is configured to load balance outbound connections to the routers." *Id.* (citing Dkt. No. 182-21 at RadwareF500791322). This says nothing about load balancing based on cost. Accordingly, the court finds that LTM "alone" does not infringe claims 24–28 of the '319 Patent.

Nonetheless, the BIG-IP accused products, pre-hotfix, may infringe claims 24–28 of the

42

'319 Patent.[22] The fact that LTM "alone" does not infringe is not dispositive of whether the BIG-IP products infringe under *Finjan* because F5 admits that the pre-hotfix BIG-IP products were loaded with software that is configured to perform the functions claimed in the '319 Patent. *See* Dkt. No. 188-6 (Thornewell Decl.) at ¶ 8 ("LTM has never been able, by itself, to load balance outgoing messages across ISPs based on cost or costing information, or any route-based metrics, without being paired with a GTM or Link Controller"). Accordingly, as F5 does not dispute that the pre-hotfix applications preloaded onto the BIG-IP product, considered together, infringe the outbound claims, the court GRANTS Radware's motion for summary judgment of infringement as to claim 24 of the '319 Patent by pre-hotfix products.

### 2.    Post-hotfix: '319 Patent Claims 24–28

As noted above, to allow for development of the factual record, the court DENIES WITHOUT PREJUDICE F5's motion for summary judgment that F5's post-hotfix products do not infringe. However, were the court to consider F5's motion with respect to claims 24–28 on the present record, material disputes of fact would preclude summary judgment.

Based on F5's representations of how its post-hotfix products operate, Radware relies on the "Least Connections, Observed, Predictive and Bandwidth" metrics to show infringement of the "costing" limitations of claims 24–28. Dkt No. 200-3 at 8–10. The parties do not dispute that Least Connections is a measure of the number of connections at a particular node. Dkt. No. 190 at 11. Both Dr. Rubin and Dr. Alexander, the parties' infringement experts, describe Least Connections as a "relatively simple [method] in that the LTM system passes a new connection to the node that has the least number of current connections." Alexander Decl. ¶ 485 (citing Rubin).

F5 argues that Least Connections does not measure costing information of the "entire route," as required by the claims. *Id.* The court agrees that Least Connections is not a measure of "costing information of said respective routes," and therefore does not infringe claims 24–28 of the '319 Patent.

---

[22] Claims 26–28 of the '319 Patent are method claims, and, as noted above, the court grants F5's motion for summary judgment of no *direct* infringement of method claims.

5:13-cv-02024-RMW
ORDER ON MOTIONS FOR SUMMARY JUDGMENT

As the court explained in its prior summary judgment order, a measurement based on "said respective routes" must be taken over the entire route. Dkt. No. 145 at 21–22. In addressing A10's motion for summary judgment of non-infringement on A10's AX Series product, the court found that the AX Series, which only measured "the properties of immediately adjacent routers" did not meet the claim limitation of "ratings based on proximity measurement taken through each of the plurality of routes." *Id.* The court reasoned that "[t]he '702 Patent contemplates taking proximity measurements through at least the entire route to the remote server . . . Radware cannot point to any part of the '702 Patent that discloses polling requests that are directed only at an adjacent router as is found in the AX Series products." *Id.* The court reaches the same conclusion as to the costing claims of the '319 Patent.[23]

The claim language as a whole further supports this conclusion. Claim 24 of the '319 Patent first defines a route as extending "from said first node to said second node" and then specifies that the route selector selects an ISP based on "costing information of said respective routes." The court also construed the phrase "a plurality of available routes from said first node to said second node" as "a plurality of available routes connecting said first node to said second node through the Internet," again showing that the route extends from the client computer to the remote server. Dkt. No. 122 at 19–20. By defining a "route" as extending from the first node to the second node, the claim clearly contemplates the entire route.

Here, the Least Connections metric does not measure a "cost" of the route—it only measures load on one portion of the route.[24] Because the Least Connections metric is not representative of "costing information of said respective routes," where the "route" must "connect[] said first node to said second node through the Internet," Least Connections does not infringe claims 24–28 of the '319 Patent. To show infringement, Radware would need to rely on a costing metric other than "Least Connections," "Observed," or "Predicted."

---

[23] As noted earlier, the '319 Patent and the '702 Patent share the same specification.

[24] According to Radware's expert, the "Observed" and "Predictive" methods also rely on the number of connections at a particular node. *See* Dkt. No. 179-26 ¶ 128. Accordingly, these methods also only measure load on a portion of a route.

5:13-cv-02024-RMW
ORDER ON MOTIONS FOR SUMMARY JUDGMENT

In fact, Radware does rely on another metric to prove infringement, the alleged "Bandwidth" method of route selection. *See* Dkt. No. 200-3 at 8 (citing Rubin Rep., Dkt. No. 182-34 ¶¶ 126, 128–29). F5 acknowledges that some of its documentation describes a bandwidth metric but states that no such metric exists in actual Radware products. Dkt. No. 190 at 11 (citing Alexander and Thornewell). F5 further notes that Radware's expert fails to identify any F5 code—even pre-hotfix—implementing the supposed bandwidth metric. *Id.* The court finds that there is a material dispute of fact as to whether F5's BIG-IP product performs a "bandwidth" method of route selection. The court therefore DENIES F5's motion for summary judgment of non-infringement as to claims 24–28 of the '319 Patent as to post-hotfix products.

### E.  Inbound Link Load Balancing

Radware asserts infringement of claims 1–7, 9–19, 21–23, and 29–32 of the '319 Patent and claims 1–4, 6–12, 14, and 15 of the '374 Patent. Radware moves for summary judgment of infringement on claims 1, 2, 7, 10, 11 and 12 of the '319 Patent and claims 9, 10, and 12 of the '374 Patent. F5 moves for summary judgment of non-infringement on the method claims (addressed above), on claims 3–12, 29, 30, and 32 of the '319 Patent, and claims 5 and 13 of the '374 Patent.

The court groups the device claims together as follows:

- o Claims 1, 2, and 12 of the '319 Patent, and claims 9, 10, and 12 of the '374 Patent, which do not claim selecting a route based on a measurement "of said respective route";

- o Claims 3–5, 29, 30 and 32 of the '319 Patent and claims 5 and 13 of the '374 Patent, which claim proximity measurements;

- o Claims 6–9 and 11 of the '319 Patent, which relate to selecting a route based on a measurement "of said respective route"; and

- o Claim 10 of the '319 Patent, which requires an Internet connection.

5:13-cv-02024-RMW
ORDER ON MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1

### 1. Claims 1, 2, and 12 of the '319 Patent and Claims 9, 10 and 12 of the '374 Patent

Radware's expert Dr. Rubin opines that the BIG-IP products infringe claims 1, 2, and 12 of the '319 Patent, and claims 9, 10, and 12 of the '374 Patent. *See* Dkt. No. 179-26 (Rubin Rep.) at ¶¶ 150–152, 154–157, 162–164, 188, 189, 192, 193, 209, 210, 220, 221, 224, 225, 228, and 229. In response, F5's expert Dr. Alexander opines that the GTM and Link Controller do not infringe independent claim 1 of the '319 Patent or independent claim 9 of the '374 Patent. Dkt. No. 198-12 (Alexander Rep.) at ¶¶ 41–72, 308–341. Dr. Alexander opines that Dr. Rubin is relying on global server load balancing (GSLB) functionality, and not link load balancing functionality, to support his infringement opinions. *Id.*

Radware argues that Dr. Alexander's report is not sufficient to rebut Dr. Rubin's report because Dr. Alexander did not perform an infringement analysis. However, Dr. Alexander did "review Professor Ruben's [sic] report and provide a rebuttal" to Dr. Rubin's infringement analysis. Dkt. No. 210-7 (Alexander Dep.) at 12:13–14. Radware's concerns about the level of detail in Dr. Alexander's report do not address Dr. Alexander's opinion that Dr. Rubin only identified GSLB functionality, and not link load balancing, in his infringement opinions. *See* Radware Reply at 10–11 (criticizing Dr. Alexander's review of the hotfix). The two expert reports both appear to present reasonable analyses of the BIG-IP software, and reach different conclusions. Summary judgment is therefore improper. *Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 322–32.

Accordingly, the court finds that there is a material dispute of fact as to whether F5's BIG-IP product is configured to perform inbound link load balancing, as claimed in claims 1, 2, and 12 of the '319 Patent, and claims 9, 10, and 12 of the '374 Patent. The court therefore DENIES the motions for summary judgment as to claims 1, 2, and 12 of the '319 Patent, and claims 9, 10, and 12 of the '374 Patent.

### 2. Claims 6–9 and 11 of the '319 Patent

Claims 6–9 and 11 of the '319 Patent require selecting an ISP "in accordance with one or more criteria of the plurality of routes." '319 Patent cl. 11. As explained above, the court finds that

46

United States District Court
Northern District of California

a criteria "of the route" means a measurement taken over the entire route. Radware cannot rely on Least Connections or similar measurements that relate only to a portion of the route to show infringement. Accordingly, Radware's motion for summary judgment of infringement regarding claims 7 and 11 is DENIED. F5's motion for summary judgment of non-infringement of claims 6– 9 and 11 of the '319 Patent by post-hotfix products is DENIED WITHOUT PREJUDICE for the reasons described above.

### 3. '319 Patent Claims 3–5, 15–17, 29, 30, and 32 and '374 Patent Claims 5 and 13: Proximity

F5 argues that the post-hotfix GTM does not measure any "proximities" through the ISP routes. Dkt. No. 190 (F5 MSJ NonInf.) at 16–17. Claims 3–5, 15–17, 29, 30, and 32 of the '319 Patent require, for example, that the network controller determines the "proximities of remote computers to the computer network via the plurality of routes and selects one of the plurality of routes based on the proximity determination." '319 Patent cl. 3. The court construed "proximity" to mean "A measurement or measurements based on hops, latency, TTL, or a combination thereof." Dkt. No. 122 at 27. As discussed above, if F5's factual representations about its post-hotfix products are true, the post-hotfix Link Controller, GTM, and LTM can ███████████████ ███████████████████████████████████████████████████████████████ as well as ███████████████████████████████████. Rubin Report ¶ 158. However, none of these metrics are "proximity" measures. Radware does not offer any counter to this conclusion. *See* Dkt. No. 200-4 (Radware Opp. to F5 MSJ NonInf.)  Nevertheless, as discussed above, the court is unwilling to grant summary judgment based on an incomplete factual record with respect to post-hotfix products. Accordingly, the court DENIES WITHOUT PREJUDICE F5's motion for summary judgment of non-infringement that F5's post-hotfix products do not infringe claims 3–5, 15–17, 29, 30, and 32 of the '319 Patent and claims 5 and 13 of the '374 Patent.

### 4. '319 Patent claim 10

Claim 10 of the '319 Patent requires that the link load balancing device be connected to the

5:13-cv-02024-RMW
ORDER ON MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

Internet:

> 1. A device for managing a computer network, said device connected to the Internet through a plurality of routes, wherein the plurality of routes are assigned with respective IP addresses, comprising: . . .

> 10. The device of claim 1, wherein said device is connected within the computer network and is further connected to the Internet through the plurality of routes.

In the prior motions for summary judgment, F5 moved for summary judgment of non-infringement, arguing that the claims of the '319 Patent "require, among other things, that the claimed apparatus be connected to the Internet through a plurality of routes." Dkt. No. 91 at 7 (F5 3/7/14 MSJ). F5 did not specifically address claim 10 of the '319 Patent, but focused on the preamble of certain claims in the '702 Patent. *Id.* In denying F5's motion, the court found that the preamble of Claim 1 of the '319 Patent "does not contemplate that the Internet and multiple[] Internet connections are structural components of the device." Dkt. No. 145 at 16. F5 now specifically addresses claim 10, and argues that this claim affirmatively requires that the device is connected to the Internet. Dkt. No. 198-14 (F5 Opp. to Radware Inf. MSJ) at 2. The court agrees. Claim 10 requires that the device be connected to the Internet in the body of claim, requiring more than mere capability and describing more than just the "purpose or intended use" of the device. *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997); *see also* MPEP § 2111.02 (9th ed. Mar. 2014). As there is no dispute that F5's device are sold unconnected to the Internet, the court finds that F5 does not directly infringe Claim 10 of the '319 Patent by making or selling its BIG-IP products. Accordingly, the court GRANTS F5's motion for summary judgment of non-infringement as to Claim 10 of the '319 Patent. This applies to direct infringement of both pre- and post-hotfix versions of BIG-IP.[25]

---

[25] At the hearing, F5 suggested that claim 12 of the '319 Patent, which recites "the device of claim 1, wherein the plurality of routes each include a respective Internet Service Provider ("ISP"), is not infringed for similar reasons. However, this argument was not made in F5's briefing. Accordingly, the court does not consider it.

United States District Court
Northern District of California

United States District Court
Northern District of California

## VI.   F5'S MOTION FOR SUMMARY JUDGMENT ON DAMAGES ISSUES

F5 moves for summary judgment on three damages issues: (1) Radware is not entitled to pre-filing damages; (2) there is no willfulness as a matter of law; and (3) Radware is not entitled to recover lost profits on the accused LTM and GTM products. Dkt. No. 187 (F5 Damages MSJ). The Court GRANTS the motion for summary judgment as to pre-filing damages and lost profits, and DENIES the motion for summary judgment as to willfulness.

### A.  Damages for Activities Prior to Filing of Complaint

F5 argues that Radware is not entitled to damages incurred prior to the filing of the complaint because Radware did not provide actual or constructive notice of infringement under 35 U.S.C. § 287.

#### 1.  Legal Standard

In order to recover damages for infringing activities prior to the filing of the complaint, a patentee must comply with 35 U.S.C. § 287(a):

> Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or by fixing thereon the word "patent" or the abbreviation "pat." together with an address of a posting on the Internet, accessible to the public without charge for accessing the address, that associates the patented article with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

"Thus, [§ 287(a)] defines that '[a patentee] is entitled to damages from the time when it either began marking its product in compliance with section 287(a)[, constructive notice,] or when it actually notified [the accused infringer] of its infringement, whichever was earlier.'" *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996) (quoting *American Medical Sys., Inc. v. Medical Eng'g Corp.*, 6 F.3d 1523, 1537 (Fed. Cir. 1993)) (formatting in original). In *Texas*

49

1   *Digital Systems, Inc. v. Telegenix, Inc.*, the Federal Circuit noted that 35 U.S.C. § 287(a) "limits

2   the extent to which damages may be recovered where products covered by a U.S. patent are sold

3   without the notice defined in the statute." 308 F.3d 1193, 1220 (Fed. Cir. 2002).

### 2.      Analysis

5   F5 argues that Radware is not entitled to damages incurred prior to the filing of the

6   complaint because Radware did not provide actual or constructive notice of infringement under

7   § 287. The parties do not dispute that Radware did not provide F5 with actual notice of

8   infringement until the filing of the complaint. F5 argues that Radware also failed to provide

9   constructive notice by selling unmarked products in the U.S. prior to the filing of the complaint.

10   Radware contends that by marking some, but not all of its products, Radware provided

11   constructive notice.

12   Radware's AppDirector, Alteon, and LinkProof products practice one or more of the

13   claims of the Asserted Patents. Specifically, the AppDirector and Alteon products practice the

14   asserted claims of the '319 and '374 Patents. *See* Dkt. Nos. 184-8 (Trachtman Dep.) at 26–29;

15   185-1 (Peles Dep.) at 79–80. The LinkProof product practices the asserted claims of the '319

16   Patent. *See* Dkt. No. 179-26 (Rubin Rpt.) ¶ 91. Radware began marking the LinkProof on

17   December 5, 2012, but did not begin marking the AppDirector and Alteon until August 6, 2013,

18   several months after the filing of the complaint. *See* Dkt. No. 184-8 (Trachtman Dep.) at 186–188.

19   Radware therefore sold unmarked AppDirector and Alteon products in the United States prior to

20   filing its complaint. *See, e.g.*, Dkt. Nos. 215-7 ████████████████████████████

21   ████████ ; 215-8 ████████████████████████████ [26]

22   Radware argues that this limited marking was justified ████████████████████

23   ████████████████████████████████████████████████████

24   ████████████. *See* Dkt. Nos. 204-7 (Zisapel 02/20/2014 Dep.) at 243:2–10; 204-9

---

[26] The court GRANTS Radware's Motion for Relief to File Objection to Reply Evidence. Dkt. No.
226. However, the court OVERRULES Radware's objection to F5's reply evidence because the
evidence submitted with F5's reply, Dkt. Nos. 215-7 and 215-8, merely provides further context
for evaluating the evidence presented in F5's opening brief. *See. e.g.,* Dkt. No. 187.

5:13-cv-02024-RMW
ORDER ON MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

(Trachtman Dep.) at 163:14–165:10. Thus, customers who purchased the unmarked products would have been directed to purchase a marked product, thereby placing the public on notice of the '319 Patent as of December 5, 2012. Dkt. No. 204-4 (Radware Damages Opp.) at 4. Radware argues that this "virtual marking of the LinkProof" constitutes sufficient constructive notice. *See* Radware Damages Opp. at 5. However, virtual marking of a product is not "substantially consistent and continuous" to constitute constructive notice. *See Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446–47 (Fed. Cir. 1998) (remanding case to the district court for a factual determination regarding whether the patentee complied with the marking statute and when compliance was achieved). A patentee must comply with § 287(a) to "obtain the benefit of constructive notice." *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996) (finding that patentee complied with marking statute by diligently attempting to ensure proper marking by licensee).

Here, it was Radware's responsibility to supply constructive notice of infringement via "substantially consistent and continuous" the marking of the products that practice the Asserted Patents. *Nike*, 138 F.3d at 1446–47. Merely encouraging a customer to buy a marked LinkProof product in combination with the unmarked AppDirector and Alteon products is not sufficient to constitute constructive notice under § 287(a). Accordingly, the court finds that Radware did not supply actual or constructive notice of infringement to F5, as required under § 287(a), and therefore Radware is not entitled to pre-suit damages. The court therefore GRANTS F5's motion for summary judgment as to pre-suit damages.

### B. Increased Damages for Willfulness

F5 moves for summary judgment that Radware is not entitled to enhanced damages for willfulness as a matter of law. As discussed above, Radware is not entitled to pre-suit damages. However, F5's conduct prior to the filing of the complaint is still relevant to evaluating F5's post-complaint conduct. As described below, Radware presents a material dispute of fact as to whether F5 was aware of the '319 Patent and engaged in conduct relevant to willfulness prior to the filing of the complaint. Therefore, the rule laid out in *In re Seagate Tech, LLC*, 497 F.3d 1360, 1374

51

1    (Fed. Cir. 2007), which prohibits enhanced damages "based solely on post-filing conduct" absent

2    filing a preliminary injunction, does not necessarily bar willfulness in this case. Accordingly, the

3    court DENIES the motion for summary judgment as to willfulness.

4                    **1.   Legal Standard**

5         The Patent Act requires a court to impose damages "adequate to compensate for the

6    infringement." 35 U.S.C. § 284. The Act also allows enhanced damages for willful infringement.

7    *Id.*; *King Instruments Corp. v. Perego*, 65 F.3d 941, 947 (Fed. Cir. 1995). To establish willfulness,

8    "a patentee must show by clear and convincing evidence that (1) the infringer acted despite an

9    objectively high likelihood that its actions constituted infringement of a valid patent," and (2) the

10   objectively-defined risk "was either known or so obvious that it should have been known to the

11   accused infringer." *Seagate*, 497 F.3d at 1374.

12        However, "[k]nowledge of a patent does not mean willfulness." *Honeywell Int'l Inc. v.*

13   *Universal Avionics Sys. Corp.*, 585 F. Supp. 2d 636, 644 (D. Del. 2008); *see also Norian Corp v.*

14   *Stryker Corp.*, 363 F.3d 1321, 1332 (Fed Cir. 2004) ("Willful infringement is not established by

15   the simple fact of infringement, even though [the accused infringer] stipulated that it had

16   knowledge of the [patentee's] patents."). The Federal Circuit has stated:

> [A] willfulness claim asserted in the original complaint must
> necessarily be grounded exclusively in the accused infringer's pre-
> filing conduct. By contrast, when an accused infringer's post-filing
> conduct is reckless, a patentee can move for a preliminary
> injunction, which generally provides an adequate remedy for
> combating post-filing willful infringement. A patentee who does not
> attempt to stop an accused infringer's activities in this manner
> should not be allowed to accrue enhanced damages based solely on
> the infringer's post-filing conduct.

22   *In re Seagate*, 497 F.3d at 1374.

23        Furthermore, "[t]he 'objective' prong of *Seagate* tends not to be met where an accused

24   infringer relies on a reasonable defense to a charge of infringement." *Spine Solutions, Inc. v.*

25   *Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1319 (Fed. Cir. 2010); *see also Innovention*

26   *Toys, LLC v. MGA Entm't, Inc.*, Case No. 14-1731, 2015 WL 1917997, at *6 (Fed. Cir. Apr. 29,

27   2015) ("[W]illfulness is not established where the defendant has a substantial . . . defense.").

28
                    52

Objectively reasonable defenses may include questions of infringement and validity. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*, 682 F.3d 1003, 1006 (Fed. Cir. 2012).

### 2.   Analysis

F5 argues that Radware is not entitled to seek increased damages for willful infringement of the '319 Patent because: (1) F5 was unaware of the '319 Patent prior to the filing of the complaint; (2) Radware did not seek a preliminary injunction; and (3) F5 has objectively reasonable defenses as a matter of law.

First, F5 argues that Radware is not entitled to enhanced damages for willfulness because F5 was not aware of the '319 Patent prior to the filing of the complaint. Radware argues that F5 had notice of the '319 Patent because: (1) F5 had notice of the related '702 Patent; (2) F5 cited the '319 Patent Application in its own patent applications; and (3) the USPTO issued a Notice of Allowance to F5 that cited the '319 Patent. Radware Damages Opp. at 8–10. Specifically, Radware points to evidence suggesting that F5 had notice of the related '702 Patent as of January 2004, and cited it in connection with F5's own patent applications. *See* Dkt. Nos. 204-24 (F5 internal email containing Radware announcement); 204-19 (F5 Answers to Radware Interrogatories) at 21–22. The '319 Patent was also cited in a Notice of Allowance sent from the USPTO to F5's representative concerning an F5 patent, where it was listed under the category "Notice of References Cited." *Id.* Finally, F5 also cited the '319 Patent Application in the course of prosecuting its own patents. *See, e.g.*, Dkt. Nos. 204-10 (Skene Depo Ex.); 204-15 (F5 email attaching F5's U.S. Patent Application 12/259,142).

F5 argues that its notice of the related '702 Patent and '319 Patent Application does not constitute notice of the '319 Patent and that even if F5 did indeed receive the Notice of Allowance citing the '319 Patent from its outside counsel, "[t]here is no reason to think that F5 (or even its outside counsel) would have reviewed the patent." Dkt. No. 215-3, F5 Damages Reply at 3, 5.

Radware's evidence creates a material dispute of fact as to whether F5 knew about the '319 Patent prior to the filing of the complaint. Both parties cite *SoftView LLC v. Apple, Inc.* in support of their respective arguments. Case No. 10-389, 2012 WL 3061027, at *5–7 (D. Del. July

53

26, 2012). In that case, the court granted defendant Kyocera's motion to dismiss willfulness allegations, finding that SoftView's allegations of pre-suit knowledge due to media publicity did not support a reasonable inference that Kyocera was aware of the patent. *Id.* at *6. However, the court did not deny the willfulness allegations against AT&T, finding that there was a "plausible basis from which one might reasonably infer that AT&T had knowledge of the patent-in-suit prior to his litigation." *Id.* The court considered three separate bases for allegations of AT&T's pre-suit knowledge, including AT&T citing a published parent application of the patent in suit while prosecuting one if its own patents. *Id.* at *5. Similarly, here, F5 cited the '702 Patent and the '319 Patent Application while prosecuting its own patents. *See, e.g.*, Dkt. Nos. 204-15 (F5 email attaching F5's U.S. Patent Application 12/259,142); 204-19 (F5 Answers to Radware Interrogatories) at 21–22.

Second, F5 argues that it is entitled to summary judgment on willfulness because Radware did not seek a preliminary injunction. F5 Damages MSJ at 2–3. Radware disagrees. Radware Damages Opp. at 11–12. Both parties rely on provided language by the Federal Circuit in *In re Seagate* to support their positions. The pertinent language in *In re Seagate* states that a patentee who does not seek a preliminary injunction "should not be allowed to accrue enhanced damages based ***solely*** on the infringer's post-filing conduct." 497 F.3d at 1374 (emphasis added); *see also SoftView*, 2012 WL 3061027 at *8 (denying motion to dismiss plaintiff's willfulness claim, where plaintiff did not move for a preliminary injunction because plaintiff adequately alleged pre-suit and post-suit conduct). Here, as discussed above, Radware's evidence creates a material dispute of fact as to whether F5 had pre-suit knowledge of the '319 Patent.

Moreover, the Federal Circuit has said that a willfulness analysis should consider the "totality of the surrounding circumstances." *Graco*, 60 F.3d at 792. Radware raises some evidence of F5's pre-filing conduct that could support willfulness. Hence, Radware's willful infringement claims are not based solely on F5's post-filing conduct, but are also based on allegations of F5's pre-filing conduct concerning the '319 Patent.

United States District Court
Northern District of California

1     Specifically, Radware alleges that F5's pre-filing conduct shows an awareness of the '319

2  Patent coupled with a desire to enter the field of link load balancing. *See, e.g.*, Dkt. Nos. 179-7 (F5

3  11/20/2000 email chain) at 029107-08; 179-9 (F5 10/2001 document) at 039434, 039442; 204-15

4  (F5 email attaching F5's U.S. Patent Application 12/259,142); 204-19 (F5 Answers to Radware

5  Interrogatories) at 21–22. A jury could find evidence of F5's pre-filing behavior relevant to

6  whether post-filing damages should be enhanced. Therefore, because Radware alleges pre-filing

7  conduct in addition to post-filing conduct, *Seagate* is not controlling and Radware did not need to

8  file a preliminary injunction in order to seek enhanced damages for willfulness.

9     Third, F5 argues that is entitled to summary judgment on willfulness because it has

10  objectionably reasonable defenses. F5 Damages MSJ at 4–5. As discussed earlier, F5 may defend

11  a willfulness claim by showing objectively reasonable defenses on infringement or invalidity.

12  However,

13          [a]s the party moving for summary judgment [F5] must do more
            than persuade [the court] that its defenses were reasonable. Instead,
14          [F5] must establish that there is no genuine dispute as to any
            material fact and that [the accused infringer] is entitled to judgment
15          as a matter of law—in other words, that no reasonable fact-finder
            could find willful infringement.

16  *HTC Corp. v. Tech. Props. Ltd.*, Case No. 08-0882, 2013 WL 5225043, at *8 (N.D. Cal. Sept. 17,

17  2013) (internal citations omitted) (citing Fed. R. Civ. P. 56(a)). As explained in this order, the

18  court has granted summary judgment of infringement of certain claims of the '319 Patent based on

19  pre-hotfix product. The court also denied in its entirety F5's Motion for Summary Judgment of

20  Invalidity. F5 has not shown that no reasonable fact finder could find willful infringement.

21  Because F5 has not met the high burden required to establish that no reasonable jury could find

22  willful infringement, the Court DENIES F5's motion for summary judgment on willfulness.

23     **C. Damages for Lost Profits**

24     Radware seeks damages in the form of lost profits of 12% of F5's GTM and LTM sales.

25  Specifically, Radware's expert Mr. Malackowski opined that:

26          Radware and its asserted technology meet the *Panduit* test;
            therefore, 100 percent of the sales are appropriately considered for
27          lost profits.

28                                                    55

United States District Court
Northern District of California

> I have reduced that analysis by 88 percent to use what I believe to be the best available evidence as a conservative measure of what apportionment would apply in a lost profits analysis.

Dkt. No. 204-31 (Malackowski Dep.) at 57:11–19; *see also* Dkt. 185-3 (Malackowski Rep.) at 72 ("it is reasonable to conclude that at least 12% of F5 customers which purchased BIG-IP [LTM or GTM] devices would have, alternatively, turned to Radware in order to obtain this important functionality but for F5's infringement."). F5 moves to exclude Radware's lost profits theory on the basis that Radware's evidence showing that Radware would be entitled to 12% of its lost profits is unreliable. The court agrees that Radware's 12% figure is not supported and GRANTS the motion for summary judgment of no lost profits on LTM and GTM sales.[27]

### 1.   Legal Standard

To recover lost profits, a patentee "must prove a causal relation between the infringement and its loss of profits" by demonstrating a reasonable probability that that "'but for' the infringement, it would have made the infringer's sales." *Bic Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993). A lost profits award cannot be speculative. *Id.* The *Panduit* factors are commonly, though not exclusively, used to show "but for" causation in a lost profits analysis by demonstrating: (1) demand for the patented product; (2) the absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit the patent owner would have made. *See Standard Havens Prods., Inc. v. Gencor Indus. Inc.*, 953 F.2d 1360, 1372–73 (Fed. Cir. 1991); *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978).

### 2.   Demand for the Patented Product Versus Demand for the Patented Feature

Radware and F5 dispute whether the first *Panduit* factor requires showing demand for the patented **product** or demand for the patented **feature**. The Federal Circuit resolved this dispute in *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1330 (Fed. Cir. 2009). The Federal Circuit explained that "[t]he first *Panduit* factor simply asks whether demand existed for

---

[27] This order does not address lost profits related to Link Controller sales.

5:13-cv-02024-RMW
ORDER ON MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

the 'patented product,' i.e., a product that is 'covered by the patent in suit' or that 'directly competes with the infringing device.'" 567 F.3d at 1330 (citing *Rite–Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1548–49 (Fed. Cir. 1995) (en banc)). The Federal Circuit rejected the argument that the first *Panduit* factor requires showing demand for the patented feature because that "argument unnecessarily conflates the first and second *Panduit* factors. . . [the first] factor does not require any allocation of consumer demand among the various limitations recited in a patent claim." *Id.* Instead, whether demand exists for the patented feature is analyzed either under the second *Panduit* factor—the existence of non-infringing alternatives—or when the patentee seeks to invoke the entire market value rule in the context of lost profits. *Id.* at 1330-31. The Federal Circuit explained this in depth, distinguishing the primary cases on which F5 relies:

> *Ferguson* dealt with lost profits under the "entire market value" rule, which permits a patentee to recover the entire value of an apparatus that contains both patented and unpatented components, so long as the patented component is the basis for customer demand. *Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC,* 350 F.3d 1327, 1346 (Fed. Cir. 2003) (vacating and remanding lost profits award for entire value of a device containing a first component embodying a first patent, found infringed, as well as a second component embodying a second patent, found not infringed, where profits could fairly be allocated to customer demand for second component); see *Rite–Hite,* 56 F.3d at 1549 ("[T]he entire market value rule permits recovery of damages based on the value of a patentee's entire apparatus containing several features when the patent-related feature is the 'basis for customer demand.' ") (quoting *State Indus., Inc. v. MorFlo Indus., Inc.,* 883 F.2d 1573, 1580 (Fed. Cir. 1989)).

*DePuy*, 567 F.3d at 1331.

Here, Radware argues that it is not relying on the entire market value rule in support of its lost profits analysis. That argument is accurate to the extent that Radware is not seeking 100% of its lost profits on 100% of F5 sales. However, Radware's expert testified that "Radware and its asserted technology meet the *Panduit* test; therefore, 100 percent of the sales are appropriately considered for lost profits," suggesting the entire market value rule might apply. Dkt. No. 204-31 (Malackowski Dep.) at 57:11–19. To the extent that Radware relies on the entire market value rule to recover lost profits, Radware must show what portion of sales were driven by demand for the patented feature, consistent with application of the entire market value rule in general. *See DePuy*,

57

567 F.3d at 1331; *see also Good Tech. Corp.*, 2015 WL 3882608 at \*4 ("The EMVR requires that where damages are based on sales of a multi-component product that includes both infringing and non-accused components, in the absence of an apportionment, a patentee must prove that the patented features are the primary driver of demand for the entire product."). Radware has not met the burden of showing what portion of sales were driven by demand for the patented feature. Radware's expert explained in his report that 12% of customers identified the patented functionality as important. Malackowski Rep. at 72. A survey showing that 12% of people found a feature important is not, standing alone, proof that the feature drove those individuals' purchases.

If Radware is simply using the *Panduit* factors to show the number of sales Radware would have made but for F5's infringement, Radware may either show the absence of non-infringing alternatives under the second *Panduit* factor, or show what portion of customers would have rejected available non-infringing alternatives and purchased Radware's products. *See* Northern District of California Model Patent Jury Instruction 5.3 ("Lost Profits—Factors to Consider") (Second factor: "that there were no acceptable non-infringing substitutes for the [product] [method] for which [patent holder] seeks lost profits, *or, if there were, the number of sales made by [alleged infringer] that [patent holder] would have made despite the availability of any acceptable non-infringing substitutes.*") (emphasis added). Radware is attempting to do the latter: to show the number of sales made by F5 that Radware would have made despite the availability of acceptable non-infringing substitutes.

The court next examines whether Radware's evidence purporting to show that Radware would have recovered 12% of the sales of GTM and LTM is sufficiently reliable to justify an award.

### 3.    Radware's Evidence Does Not Support a 12% Lost Profit Award

As just explained, Radware must provide reliable evidence that but for F5's sales of the BIG-IP products, Radware would have made sales of its own device. Radware's expert opines that Radware would have recovered 12% of F5's sales, once F5 stopped infringing Radware's patents.

5:13-cv-02024-RMW
ORDER ON MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Dkt. 185-3 (Malackowski Expert Rpt.) at 71–73. The court finds Radware's evidence supporting a

2  12% lost profit award legally insufficient.

3        Radware attempts to justify its lost profits calculation based on a 2011 survey conducted

4  by TechValidate.[28] The survey targeted F5 customers that used an Oracle solution and had 261

5  respondents. *Id.* at 71. The survey listed seventeen features of F5's BIG-IP product, including link

6  load balancing, compression, and advanced routing, and asked customers to select any and all

7  features that they considered important to performance. *Id.* at 71–72. 12% of respondents selected

8  link load balancing as an "important" feature. Based on these results, Malackowski concludes that

9  12% of F5 customers who purchased BIG-IP GTM devices would have alternatively purchased

10  Radware products but for F5's infringement. *Id.* at 72. However, the survey demonstrates that

11  multiple features, including features unrelated to the Asserted Patents, drive the demand for the

12  accused products. *See id.* For example, 72% of participants selected "local load balancing

13  methods" and 48% of participants selected "SSL offload" as functionalities important to

14  performance. *Id.* Simply put, the survey does not support the conclusion that had F5 exited the

15  market, 12% of F5 customers would have turned to Radware. Here, the TechValidate survey does

16  not in any way suggest the patented feature was the primary reason that customers purchased the

17  infringing product. In other words, the survey is not evidence that but for the infringing sales,

18  some consumers would have instead purchased Radware's products for the reason that they

19  offered the infringing feature.

20        Moreover, Malackowski's analysis does not attempt to account for the different features

21  between the Radware products and F5 accused products. The TechValidate survey listed some

22  functionalities that are proprietary to F5, such as iRules and iControl. *See* Malackowski Rep. at

23  72; 184-4 (Brewer Decl.) ¶ 18. But Malackowski's report offers no evidence addressing the

24  significance of these proprietary functions to F5 customers. Interestingly, the survey shows that

25

26  _____

[28] Although Mr. Malackowski testified that he relied on "the totality of the information in [his]
27  report," the only evidence cited in support of the 12% figure is the TechValidate survey. *Compare*
Malackowski Dep. at 52:19–20 *to* Malackowski Rep. at § 10.4.1.2.

28
5:13-cv-02024-RMW
ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1    39% of participants considered the iRules function important to performance. *See* Malackowski

2    Rep. at 72. F5 points out that under Malackowski's reasoning, 39% of survey participants would

3    not have bought a Radware product because it did not contain the iRules function, suggesting that

4    the Radware and F5 products are not interchangeable. F5 Damages MSJ at 17.

5           Because Malackowski cannot rely on the TechValidate survey to show that Radware

6    would have made 12% of F5's LTM and GTM sales "but for" F5's infringement, the court

7    GRANTS F5's motion for summary judgment as to Radware's entitlement to seek lost profits.

8    **VII.    CONCLUSION**

9    For the reasons explained above, the court orders as follows:

10   •  Radware's Motion to Strike is:

11        o  GRANTED as to F5's Section 101 invalidity defense and F5's Motion for

12            Judgment on the Pleadings;

13        o  DENIED as to those portions of F5's Motion for Summary Judgment that rely upon

14            GSLB;

15        o  GRANTED as to those portions of F5's Motion for Summary Judgment that rely

16            upon BGP; and

17        o  DENIED as to the declaration of Dr. Peter Alexander.

18   •  F5's Motion for Judgment on the Pleadings is DENIED.

19   •  F5's Motion to Amend its Invalidity Contentions is DENIED.

20   •  Radware's Motion for Sanctions under Rule 37 is DENIED subject to the conditions

21        specified.

22   •  Radware's Motion for Summary Judgment regarding F5's invalidity affirmative defense is:

23        o  DENIED as to the allegedly abandoned prior art references;

24        o  GRANTED as to the testbed systems as prior art;

25        o  DENIED as to the Maki-Kullas patent; and

26        o  DENIED as to the Cisco DD white paper references.

27   •  F5's Motion for Summary Judgment of Invalidity is:

28

United States District Court
Northern District of California

60

1        ○  DENIED that GSLB anticipates the Asserted Patents;

2        ○  DENIED that BGP anticipates the Asserted Patents; and

3        ○  DENIED that the Asserted Patents are obvious.

4  •  On the infringement motions:

5      ○  Per the parties' agreement, F5's Motion for Summary Judgment of no direct

6          infringement of the asserted method claims[29] is GRANTED (pre- and post-hotfix).

7      ○  Radware's Motion for Summary Judgment of Infringement is GRANTED as to

8          claim 24 of the '319 Patent (pre-hotfix).

9      ○  F5's Motion for Summary Judgment of Non-Infringement is GRANTED as to '319

10        Patent claim 10 (pre- and post-hotfix direct infringement).

11      ○  Both parties' motions are DENIED as to the remaining claims/products.

12  •  F5's Motion for Summary Judgment on damages is GRANTED as to pre-complaint

13  damages and lost profits on the LTM and GTM sales and DENIED as to willfulness on

14  pre-hotfix products.

15  •  F5 has 30 days from the date of this order to make its updated, post-hotfix source code

16  available for inspection to Radware and provide Mr. Thornewell or a mutually agreed

17  witness to testify about it. At that point, F5 may renew its Motion for Summary Judgment

18  of Non-Infringement as to post-hotfix products.

19  •  The court has filed an unredacted copy of this order under seal. If a party believes that the

20  redacted portion discloses confidential information, it must file a version of the order with

21  proposed redactions and provide a declaration setting forth the bases for asserting

22  confidentiality. The declaration and proposed redactions may be filed under seal. The court

23  will evaluate any such confidentiality contention and make a decision whether to approve

24  the proposed redaction or to remove it, thus rendering the underlying content public. Any

25  proposed redactions and declarations in support must be filed by October 26, 2015. Any

26

27  _____

[29] '319 Patent claims 13–23 and 26–28; '374 Patent claims 1–4 and 6–7.

28

5:13-cv-02024-RMW

ORDER ON MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

responses to the proposed redactions must be filed by November 3, 2015. Thereafter, a copy of this order with the approved redactions will be made public.

**IT IS SO ORDERED.**

Dated: October 15, 2015



Ronald M. Whyte
United States District Judge

5:13-cv-02024-RMW
ORDER ON MOTIONS FOR SUMMARY JUDGMENT