UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RADWARE, LTD., et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>F5 NETWORKS, INC.,<br><br>　　　　Defendant. | Case No.  5:13-cv-02024-RMW<br><br>**ORDER GRANTING MOTION FOR RECONSIDERATION**<br><br>Re: Dkt. No. 274-3 |

This court granted plaintiff Radware leave to file a motion for reconsideration of the portion of the court's October 15, 2015 summary judgment order dealing with lost profits. Dkt. No. 274-4. Defendant F5 filed an opposition, Dkt. No. 283-4, and plaintiff filed a reply, Dkt. No. 290-4. After reconsideration, the court concludes that there are triable issues of fact as to whether there is a reasonable probability that "but for" infringement (if proven) by F5, Radware would have made sales of its competing products. Therefore, the court grants Radware's motion for reconsideration and vacates that portion of the court's October 15, 2015 order granting summary judgment to F5 on Radware's claim for lost profits.

## BACKGROUND

Radware alleges that F5 infringes certain claims of U.S. Patent Nos. 8,266,319 (the "'319 Patent") and 8,484,374 (the "'374 Patent"), both of which relate to link load balancing in a multi-

homed environment, that is, a network with multiple connections to the Internet. *See* '319 col.15 ll.34–37. "Link load balancing" is a process for allocating network communications across these connections.

Radware accuses F5's BIG-IP Application Delivery Controller ("BIG-IP") of infringement. The infringement issues focus on three out of fourteen modules contained within F5's BIG-IP product: the Link Controller, Local Traffic Manager ("LTM"), and Global Traffic Manager ("GTM"). Dkt. No. 179-3 at 10-11. Radware asserts that these modules each implement its claimed link load balancing feature.

Link Controller's primary purpose is to provide ISP link load balancing functionality. In contrast to Link Controller, LTM's "primary functionality is local server load balancing, not ISP load balancing. In particular, an LTM can sit between a local network and the internet, and control the routing of incoming messages to different servers." Dkt. No. 184-3 (Brewer Decl.) ¶ 8; *see* Dkt. 374-27at 43 (Malackowski Rpt.). "GTM's primary functionalities [are to provide] domain name system ("DNS")-related services and global server load balancing ('GSLB'). DNS services relate to responding to client requests for IP addresses associated with a domain name (e.g., 'Amazon.com')." *Id.* ¶ 9. LTM and GTM also have the ability to do ISP link load balancing.

F5 claims that in December 2014, it made changes to the accused products via a "hotfix" to remove the patented link load balancing functionality that Radware accuses of infringement. Dkt. No. 207 at 3-4. The consequence of the hotfix is beyond the scope of this order.

Radware seeks damages in the form of lost profits for sales made by F5 of its Link Controller, GTM and LTM products. Radware claims that but for F5's infringement it would have sold more of its Alteon and LinkProof products. F5 submits that it is entitled to summary adjudication on Radware's lost profits claim resulting from F5's sales of its GTM and LTM modules because Radware cannot show that but for F5's presence in the market it would have obtained those sales. F5 does not seek summary judgment on Radware's claim for lost profits based on F5's sales of its Link Controller.

Radware supports its lost profits claim with the opinion of its economic expert, James

Malackowski, who does an analysis of the four requirements for entitlement to lost profits set forth in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978). Malackowski relies heavily on a 2011 survey conducted by TechValidate. Dkt. Nos. 185-3, 274-17 (Malackowski Rep.) at 71-74. The survey targeted F5 customers that used an Oracle solution[1] and had 261 respondents. *Id.* at 71. The survey listed seventeen features of F5's BIG-IP product, including link load balancing, compression, and advanced routing, among others, and asked customers to select any and all features that they considered important to performance. *Id.* at 71–72. Twelve percent of respondents selected link load balancing as an "important" feature. Based on these results, Radware's expert concluded that 12% of F5 customers who purchased BIG-IP LTM and GTM devices would have alternatively purchased Radware products but for F5's infringement. *Id.* at 71-73.

F5 moves to exclude Radware's lost profits theory on the basis that Radware's evidence does not provide a reliable basis for concluding that 12% of F5's sales of LTM and GTM would have been made by Radware but for F5's alleged infringement. Dkt. No. 187 at 10-18. This court agreed and, on October 15, 2015 granted F5's motion for summary judgment on Radware's claim that it lost profits as a result of F5's LTM and GTM sales. Dkt. No. 294 at 55-60.

The court now reconsiders that ruling.

## ANALYSIS

**The *Panduit* Factors**

To recover lost profits, a patentee "must prove a causal relation between the infringement and its loss of profits" by demonstrating a reasonable probability that "'but for' the infringement, it would have made the infringer's sales." *Bic Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993). The *Panduit* factors are commonly, though not exclusively, used to show "but for" causation in a lost profits analysis by demonstrating: (1) demand for the patented product; (2) the absence of acceptable non-infringing substitutes; (3) manufacturing and

---

[1] What is included in "an Oracle solution" is not explained.

1  marketing capability to exploit the demand; and (4) the amount of profit the patent owner would
2  have made. *Bic Leisure Prods., Inc*., 1 F.3d. at 1217-18 (citing *Panduit Corp. v. Stahlin Bros.*
3  *Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978)). "The finding of the amount of damages for
4  patent infringement is a question of fact on which the patent owner bears the burden of proof."
5  *Bic,* 1 F.3d. at 1217. A lost profits award cannot be speculative. *See e.g., Lucent Techs., Inc., v.*
6  *Gateway, Inc.,* 580 F.3d 1301, 1340 (Fed. Cir. 2009).

### 1.    Factor One: Demand for the Patented Product

Radware and F5 dispute whether the first *Panduit* factor requires showing demand for the patented ***product*** or demand for the patented ***feature***. In *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1330 (Fed. Cir. 2009), the Federal Circuit explained that "[t]he first *Panduit* factor simply asks whether demand existed for the 'patented product,' i.e., a product that is 'covered by the patent in suit' or that 'directly competes with the infringing device.'" *Id.* at 1330 (citing *Rite–Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1548–49 (Fed. Cir. 1995); *Versata Software, Inc. v. SAP America, Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013). The Federal Circuit rejected the argument that the first *Panduit* factor requires showing demand for the patented feature because that "argument unnecessarily conflates the first and second *Panduit* factors. . . [the first] factor does not require any allocation of consumer demand among the various limitations recited in a patent claim." *Id.* Instead, whether demand exists for the patented feature is analyzed either under the second *Panduit* factor—the existence of non-infringing alternatives—or when the patentee seeks to invoke the entire market value rule in the context of lost profits. *Id.* at 1330-31. Radware does not claim that the patented feature of link load balancing drives all customer demand for LTM or GTM and, therefore, it does not seek to invoke the entire market value rule.

*DePuy,* however, does not hold that demand for the patented feature is irrelevant to the *Panduit* analysis ***as a whole***. It is true that the *DePuy* court did not require a plaintiff to show "demand for the specific feature (i.e., claim limitation) that distinguishes the patented product from a noninfringing substitute" under *Panduit* factor one. 567 F.3d at 1330. However, *DePuy* is distinguishable from the present case. The patented product at issue in *DePuy* was a surgical

4
5:13-cv-02024-RMW
ORDER GRANTING MOTION FOR RECONSIDERATION

screw, and both parties in that case agreed that the polyaxial capability of the screws—"an inherent feature of the patented screws, not a feature of some other, unpatented device that may also be used in the surgery"—drove demand for the screws. *Id.* at 1331. The *DePuy* court did not consider a case such as the present one in which the products at issue incorporate distinct features that are not covered by the asserted patents.

Radware has shown demand for both its own products and for F5's GTM and LTM allegedly infringing products. F5's challenge to factor one of *Panduit* is based upon the mistaken view that factor one requires demand for the patented feature and not just the patented product. However, demand for the patented feature is relevant to *Panduit* factors 2 and 4. *See below*.

### 2. Factor Two: Absence of Acceptable Non-Infringing Alternatives

Radware claims that the court erred in granting summary judgment for F5 on Radware's lost profits claim by not recognizing that Radware's claim is based upon the absence of non-infringing alternatives and not on a determination of what portion of customers would have rejected available non-infringing alternatives. Radware asserts that there are no non-infringing alternatives.

Radware submits that "at a minimum, there are disputed issues of fact for the jury to decide as to the existence of acceptable non-infringing alternatives." Dkt. No. 274-3 at 1. Radware offers testimony from its technical expert, who allegedly relied "on a variety of factors, including but not limited to his experience in the industry, the objective evidence of non-obviousness of the patented inventions, F5's own documents and witness testimony" to conclude that there are no acceptable non-infringing alternatives. *Id.* at 5-6.

F5 disagrees, arguing that the court's summary judgment order necessarily found "no genuine dispute that non-infringing alternative versions of GTM and LTM would have been available and acceptable." Dkt. No. 284 at 4. F5 mistakenly reads the court's prior order to so hold. The court only suggested what might be a non- infringing substitute; *see* Northern District of California Model Patent Jury Instruction 5.3 ("An acceptable non-infringing substitute may involve modifying the [alleged infringer's] product to avoid infringement by adding an available

alternative or by removing the patented feature from the product altogether."). F5 argues, in opposing summary judgment, "Radware has offered no argument or evidence that GTM and LTM, without the infringing technology, would be unacceptable substitutes for the accused versions of those products." Dkt. No. 284 at 9. In reply, Radware argues that such versions of GTM and LTM without the accused functionality are merely "hypothetical." Dkt. No. 290-3 at 2.

The court has reconsidered the evidence presented and concludes that there is a triable issue of material fact as to the existence of acceptable non-infringing alternatives. An acceptable alternative to GTM and LTM would have to have the advantages of the patented invention that were important to those who purchased the GTM and LTM products. If the purchasers of GTM and LTM were not motivated or interested in the patented link load feature then GTM and LTM without the link load feature may be found to be acceptable alternatives.

### 3. Factor 3: Manufacturing and Marketing Capability

F5 does not challenge Radware's manufacturing and marketing capability.

### 4. Factor 4: Radware's Proffered Evidence of Causation and the Amount of Lost Profit

F5 does not challenge in its motion the calculations of what Radware makes on the sale of its products. Rather, F5 claims that Radware cannot establish what is the fundamental purpose of the *Panduit* test: determining whether a plaintiff has shown that, "but for" infringing conduct, the plaintiff would have made additional sales. "To recover lost profits damages, the patentee must show a reasonable probability that, 'but for' the infringement, it would have made the sales that were made by the infringer." *Rite-Hite Corp.*, 56 F.3d at 1545.[2] If the patent holder makes a prima facie showing of the *Panduit* factors, the burden shifts to the alleged infringer to show that the patent holder's "but for" causation analysis is unreasonable under the circumstances. *Id*. What F5 challenges is the proposition that Radware would have made additional sales with F5 out of the market. According to F5, "[t]here is insufficient evidence, as a matter of law, for a reasonable jury

---

[2] Notably, while the *Panduit* factors are a means of showing causation, "*Panduit* is not the *sine qua non* for proving 'but for' causation." *Id.* at 1548.

to find that Radware would have made sales of its products 'but for' the accused ISP load balancing functionality in LTM and GTM." Dkt. No. 187 at 6. F5 is particularly critical of Radware's reliance on the TechValidate survey. "[T]he survey demonstrates that multiple features, including features unrelated to the asserted patents, drive the demand for the accused products. For example, 72% of participants selected 'local load balancing methods' and 48% of participants selected 'SSL offload' as functionalities important to performance." *Id.* (citing Dkt. No. 185-3 at 72). Moreover, the survey listed some functionalities that are proprietary to F5, such as iRules and iControl. *Id.*

The court agrees that the survey offers little support for Radware's 12% figure. However, a patent owner is not required to prove its damages with mathematical precision. *Standard Havens Prods., Inc. v. Gencor Indus.., Inc.*, 953 F.2d 1360 (Fed. Cir. 1991). After reconsidering the evidence that may be relevant to whether Radware lost sales to F5, the court concludes that there is sufficient proof of probable lost sales to allow the jury to make an estimate of the amount, if any, of profits actually lost. Admittedly, there is no evidence that calculates the amount of lost sales on its face. However, there is evidence from which a jury could come up with a reasonable estimate. This evidence, which is obviously disputed, includes the inference of the amount of lost sales drawn from the fulfilling of the *Panduit* factors (*see Rite-Hite*, 56 F.3d at 1545), the fact Radware and F5 are competitors, the fact that F5 has urged the purchase of GTM and LTM for link load balancing and the fact that there is no acceptable alternative to LTM and GTM.

## ORDER

For the above reasons, the court grants Radware's motion for reconsideration and vacates that portion of the court's October 15, 2015 order granting summary judgment to F5 on Radware's claim for lost profits.

**IT IS SO ORDERED.**

Dated: February 3, 2016

_Ronald M. Whyte_
Ronald M. Whyte
United States District Judge